JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Sammy Quick, appeals from his convictions on two counts of theft, securing writings by deception, mortgage broker prohibition, and receiving stolen property. The charges arose out his participation in a foreclosure rescue scheme.[1] Quick argues that none of the charges were supported by the sufficiency and weight of the evidence, that counsel was ineffective for failing to offer into evidence certain documents, and that the court erred by ordering him to pay restitution.
 {¶ 2} The victim, Linda Hill, previously lived with her mother. When the mother developed Alzheimer's Disease, she required nursing care. Unable to pay for the care, the mother transferred title of the house to Hill so that Hill could *Page 4 
take out a mortgage on the house and use the proceeds to pay the nursing home. Hill used Quick and the mortgage company he then worked for to arrange the financing. That loan transaction went forward without incident.
 {¶ 3} In the fall of 2004, Hill entered drug rehabilitation for a 10-month period. During that time, she fell behind on her mortgage payments and the house went into foreclosure. She called Quick and asked him for assistance. He proposed a scheme whereby Hill could save her home and continue to live there, while at the same time working toward reestablishing her credit. He told her they would "take the house out of my name" for a period of one year to 18 months and at the end of that time, the house would "go back into my name and that I would begin to make payments." During the time that she did not have title to the house, she would pay rent to the person who did own title. Hill testified that at no point did she understand Quick to be proposing that she would sell her house, and she believed that she would get her house back after she rehabilitated her credit.
 {¶ 4} Quick soon asked Hill to "sign[] some papers," but she did not know what those papers were. She thought that she would be receiving $10,000 to pay off her credit cards as a result of transferring the house, but received nothing. She also testified that she did not enter into any lease or rental agreement as a result of her arrangement with Quick and codefendant Brian Cicerchi, Quick's equal partner in First Primary Mortgage Corporation. *Page 5 
 {¶ 5} Telephone calls from Hill's creditors prompted her to contact Quick. She met him at a bank and Quick gave her a check from a title company in the amount of $56,212.58. He asked her to write "pay to the order of" on the check to make it payable to him. He then signed the check, cashed it, and gave her $4,500. Apart from another payment of $3,750, she received no additional funds from her arrangement with Quick.
 {¶ 6} In November 2005, a letter sent by a mortgage company and addressed to a "Lesley Loney" arrived at Hill's house. Hill opened the letter and discovered that the mortgage on her house was $1,300 per month — an amount that far exceeded her monthly net income at the time. She contacted the Better Business Bureau, which in turn contacted the mortgage company. The mortgage company then investigated the loan and discovered that Quick had arranged for the sale of Hill's house without her knowledge. An investigator for the mortgage company testified that the loan application had been signed by Loney and indicated that the borrower intended to use the house as a primary residence. The investigator said that it learned that Loney had been collecting rent from Hill, in violation of Loney s representation on the loan agreement that the house would be used as her primary residence. The mortgage company considered this fraudulent information because it would have charged a higher interest rate for property used for investment purposes. *Page 6 
 {¶ 7} Loney testified[2] that she was the sister of Cicerchi. She said that Cicerchi approached her and asked for a "favor." They told Loney that they had a client who was losing her house and needed help refinancing: "They wanted me to purchase the home that she lived in so they could, temporarily, I guess rent it out, so we could rent it out to her so that she could refinance within a year or so after her credit got better and she got back on her feet." Loney did not agree, and a few weeks later Cicerchi asked her if she had given thought to his proposal. She expressed reluctance but Cicerchi pressured her. She agreed to do so on the condition that Cicerchi take care of collecting a monthly payment from Hill and use that money to pay the mortgage company.
 {¶ 8} Loney did not sign any purchase agreement for the house and testified that the purchase agreement offered into evidence bore a signature that was not hers and, in fact, misspelled her first name. A handwriting expert verified that the signatures of both Loney and Hill that appeared on the purchase agreement were inauthentic.
 {¶ 9} At the time of closing, Hill owed $86,504.85 to First Horizon Home Loan Corporation on her mortgage. The purchase agreement listed a sale price of $150,000, and after deductions for a down payment on the mortgage and certain expenses, Novastar (the new lender) payed out to Hill a total of *Page 7 
$56,212.58. Loney testified that she signed certain closing documents, but discovered the selling price of the house only during court proceedings. She also acknowledged that she signed the mortgage agreement having represented that the property would be used as a primary residence even though she had no intention of living there.
 {¶ 10} Less than one year after signing the loan documents, Loney received notices that the mortgage payments were late, so she began making the payments. She testified that at no point had she received rent payments from Hill.
 {¶ 11} The state theorized that Quick and Cicerchi used Hill's money to purchase a bar that they co-owned. A former bar owner testified that he sold his bar to Quick and Cicerchi just one month after they created the purchase agreement for Hill's house. Quick's banking records showed that on the same day that Hill received the settlement proceeds on her original loan, he deposited $51,712.58 into an account in the name of "Search Quick Inc." In a two-month period, Quick wrote checks to "cash" in the amount of $46,435.85, and also wrote a check to a national brewery.
 I *Page 8 {¶ 12} Quick's first assignment of error argues that his convictions for theft, securing writings by deception, and receiving stolen property were not supported by sufficient evidence.
 A {¶ 13} When reviewing a claim that there is insufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1981), 61 Ohio St.3d 259, paragraph two of the syllabus.
 B {¶ 14} The state charged Quick with theft under R.C. 2913.02(A)(3), which states that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception[.]" These counts related to (1) the proceeds from the sale of Hill's house and (2) Novastar's decision to lend Loney the money based on Quick's misrepresentations in the loan application. Quick's argument does not differentiate between the two counts. He instead maintains that he was not attempting to deprive Hill of her property, but was "attempting to help a woman whose drug addiction put her in jeopardy of being homeless." This argument relates solely to theft of Hill's equity in the house, so we deem any argument *Page 9 
relating to theft in the context of the Novastar loan application to be waived under App. R. 16(A)(7).
 {¶ 15} Viewing the evidence in a light most favorable to the state, a rational jury could have concluded that the state produced sufficient evidence to prove all the essential elements of theft. The state charged Quick with engaging in a foreclosure rescue scheme with the object of stealing Hill's equity in her house and turning her into a tenant in the home she once owned. When Hill received the proceeds from the sale of her house to Loney, Quick told her to sign the check over to him. He then took the proceeds and deposited them into an account he held with Cicerchi. The state offered compelling circumstantial evidence to show that Quick and Cicerchi used those proceeds to fund their purchase of a bar. Rather than assist Hill with keeping her house, Quick obtained control over the equity in her house and used it for his own purposes. In doing so, he deceived Hill into thinking that she could regain control over her house. He did not tell her how this would be accomplished, nor did he ever disclose to her who would be holding title to the house. At no point did he specifically tell her that she would be selling her house. The evidence showed that he simply gave her a stack of papers to sign and a few days later asked her to meet him at a bank so that she could sign a check over to him.
 {¶ 16} Even had Quick made Hill aware that she was selling the house, there was no legal basis for him to keep her equity in the house. He neither *Page 10 
bought nor sold Hill's house, so he had no claim to her equity in the house. At all events he deceived her into thinking that her equity would be used to pay for outstanding debts. By taking control of that money under the guise of rescuing Hill's mortgage, he deceptively converted the money for his own purposes.
 C {¶ 17} Count 5 charged that Quick secured writings by deception, in violation of R.C. 2913.43, by knowingly sending a fraudulent loan application from Loney to Novastar, causing Novastar to issue Loney a loan.
 {¶ 18} R.C. 2913.43(A) states: "No person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred." R.C. 2913.01(A) defines "deception" as "knowingly deceiving another or causing another to be deceived by any false or misleading misrepresentation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 19} The issue is whether Novastar executed any "writing" which caused it to dispose of or encumber property or incur a pecuniary obligation. The state argues that Novastar executed a writing that provided loan proceeds to Loney, but there is no evidence in the record to support that statement. At no point did *Page 11 
the state produce any "writing" executed by Novastar's authorized representative. The loan agreement itself was not admitted into evidence, nor did the state produce it for trial. The only documents provided by Novastar were the loan application and a borrower's certification. Both of those documents were executed by Loney, not Novastar.[3]
 {¶ 20} It is tempting to assume that Novastar memorialized its loan to Loney in writing, but that fact is an essential element of the offense which had to be proven beyond a reasonable doubt. The best evidence rule would therefore require the state to offer an original writing. See Evid. R. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio."). The record shows no evidence whatsoever of any writing executed by Novastar. The state's failure to offer proof on that element is fatal to the securing writings by deception count. We therefore sustain this part of the assignment of error.
 D *Page 12 {¶ 21} Quick next argues that the state failed to establish the elements of receiving stolen property as it pertained to his possession of Hill's equity in the house. He claims that he informed all parties that he would be holding Hill's money to pay for the property and as collateral for a lease.
 {¶ 22} R.C. 2913.51(A) states: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."
 {¶ 23} The evidence shows that Quick not only received the equity in Hill's house, but that he deposited that money into an account with the name "Search Quick, Inc." The address listed on the account was the same address as the bar that Quick and Cicerchi bought. The jury could reasonably have found that withdrawals made from that account during the relevant time period were used to make payments on a cognovit note held by the person who sold the bar to Quick and Cicerchi. A check made out to a national brewery further substantiated the state's allegation that Quick used the stolen equity to fund the purchase and operation of the bar. This evidence contradicted Quick's assertion that he was "holding [Hill's] money to pay for the property" and that it was "collateral for a lease." It was sufficient to prove that Quick disposed of Hill's equity with knowledge that the equity had been stolen.
 E *Page 13 {¶ 24} Quick next argues that the state failed to offer sufficient evidence to prove that he engaged in telecommunications fraud as prohibited by R.C. 2913.05. This argument is set forth in conclusory form, with no citation to statute or authority. Because it has not been independently argued as required by App. R. 16(A)(7), we disregard it.
 F {¶ 25} Finally, Quick maintains that the state did not offer sufficient evidence to show that he operated without a loan officer's license in violation of R.C. 1322.07(E).
 {¶ 26} Count 6 of the indictment charged Quick with "mortgage broker prohibitions" under R.C. 1332.07(E). That section states:
 {¶ 27} "No mortgage broker, registrant, licensee, or applicant for a certificate of registration or license under sections 1322.01 to 1322.12
of the Revised Code shall do any of the following:
 {¶ 28} "* * *
 {¶ 29} "(E) Knowingly make, propose, or solicit fraudulent, false, or misleading statements on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document. For purposes of this division, "fraudulent, false, or misleading statements" does not include mathematical *Page 14 
errors, inadvertent transposition of numbers, typographical errors, or any other bona fide error."
 {¶ 30} R.C. 1322.01(G)(1) defines a "mortgage broker" as "[a] person that holds that person out as being able to assist a buyer in obtaining a mortgage and charges or receives from either the buyer or lender money or other valuable consideration readily convertible into money for providing this assistance[.]"
 {¶ 31} An investigator for the state of Ohio Department of Commerce, Financial Institutions Division, testified that Quick had been issued a "loan officer" license in May 2002, but that license was terminated in September 2002. Quick then obtained an "operations manager license" in December 2002, but that license was terminated in April 2005. The events giving rise to the crimes listed in the indictment began in July 2005. When the state asked the financial institutions investigator if, "[b]ased on your review of the licensing in August of 2005, did Mr. Quick have a license, valid license in the State of Ohio?" the investigator answered "no."
 {¶ 32} It is unclear why the state charged Quick under R.C. 1322.07(E). Throughout this case, it argued that Quick acted without a valid mortgage broker's license. For example, in its closing argument, the state told the jury that count 6 dealt with "the fact that there is a mortgage broker. You remember [the witness from the department of commerce] saying that there are rules with *Page 15 
regard to being a mortgage broker. They knew they didn't have a license, they knew they needed a license. They violated that."
 {¶ 33} This argument more properly relates to R.C. 1322.02(A). That section states:
 {¶ 34} "(A)(1) No person, on the person's own behalf or on behalf of any other person, shall act as a mortgage broker without first having obtained a certificate of registration from the superintendent of financial institutions for every office to be maintained by the person for the transaction of business as a mortgage broker in this state. A registrant shall maintain an office location in this state for the transaction of business as a mortgage broker in this state.
 {¶ 35} "(2) No person shall act or hold that person's self out as a mortgage broker under the authority or name of a registrant or person exempt from sections 1322.01 to 1322.12 of the Revised Code without first having obtained a certificate of registration from the superintendent for every office to be maintained by the person for the transaction of business as a mortgage broker in this state."
 {¶ 36} The state did not, however, charge Quick under R.C. 1322.02(A). The question we face is whether Quick qualified as a "mortgage broker" for purposes of R.C. 1322.07(E), even though he did not have a valid mortgage broker's license at the time he brokered the sale of Hill's house. On its face, R.C. 1322.01(G)(1) broadly defines a "mortgage broker" as "a person that holds that *Page 16 
person out as being able to assist a buyer in obtaining a mortgage and charges or receives from either the buyer or lender money or other valuable consideration readily convertible into money for providing this assistance[.]" That definition does not require licensing, but merely that the person hold himself out as being able to assist a buyer in obtaining a mortgage.
 {¶ 37} The state offered evidence to prove that Quick held himself out as a person who could assist Loney with a residential loan application and dealing with Novastar. The loan application that Loney submitted to Novastar was a "uniform residential loan application" with the name "First Primary Mortgage, Inc." listed on each page. Quick signed the application as an "interviewer" so he actively assisted Loney with obtaining a mortgage. The state did not, however, offer any evidence to show that Quick charged or received money or other consideration for providing mortgage broker services. Loney testified that she was doing Cicerchi a "favor" by lending him the money needed to buy Hill's house, and there is no evidence that she agreed to pay him any fee for his services.
 {¶ 38} The Novastar investigator corroborated Loney's testimony. During her cross-examination, the Novastar investigator was asked whether she "specifically ask[ed] the person who said he was Sammy Quick whether or not they received a fee for setting up this mortgage. The investigator replied: "I did not ask [Quick] if he received a fee." The investigator did testify that "[b]rokers *Page 17 
are entitled to a broker fee and a yield spread premium which are typically disposed on the HUD-1 Settlement Statement." The state offered the settlement statement into evidence, but did not offer any testimony to show whether Quick charged or received money or other consideration for brokering the loan. A section of the settlement statement titled "division of commission" is left blank, and there are no other charges on the statement that would pertain to a mortgage broker's commission. A representative from the title company that prepared the settlement statement was asked, "is there a fee to First Primary Mortgage on the settlement?" He replied, "[t]here is not." On cross-examination, the title company representative was asked, "[t]here were no brokerage fees, were there?" The representative replied, "[t]hat is correct."
 {¶ 39} The state implied that the absence of any fees taken by Quick and his company proved that Quick knew he could not accept fees with a revoked mortgage broker's license. That argument would be relevant if the state had charged Quick under R.C. 1322.02(A), but it is irrelevant for purposes of an offense charged under R.C. 1322.07(E). By failing to prove that Quick received money or other consideration for brokering the mortgage, the state failed to show that Quick was a "mortgage broker" as defined by R.C. 1322.01(G)(1). It follows that the state did not establish an essential element of mortgage broker fraud under R.C. 1322.07(E), so the conviction under that section was not supported by sufficient evidence. *Page 18 
 G {¶ 40} In conclusion, we find that the state failed to present sufficient evidence to prove the offense of securing writings by deception as charged in count 5 and a violation of the mortgage broker's act for making false or misleading statements as charged in count 6. The first assignment of error is sustained in part as to those counts. The remaining counts were supported by sufficient evidence so the first assignment of error is overruled in part.
 II {¶ 41} For his second assignment of error, Quick complains that the jury's verdict was against the manifest weight of the evidence. He maintains that he acted charitably to help the drug-addicted victim keep her house, and Hill was aware at all times that she would be giving up title to the house. He claims that she forgot the terms of their agreement and stopped making payments as agreed, and it was only when he tried to evict her that she raised any complaints about the propriety of their arrangement.
 {¶ 42} The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten
(1986), 33 Ohio App.3d 339, 340. The use of the *Page 19 
word "manifest" means that the trier of fact's decision must be plainly or obviously contrary to all of the evidence. This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v. Antill (1964), 176 Ohio St. 61, 67.
 {¶ 43} The evidence showed that Quick engaged in a classic mortgage rescue fraud that duped Hill to sell her house and ultimately lose the equity she had in that house. Although Quick represented to Hill that his plan "could save [her] home" and that she could live in the house "for a year to 18 months without having to pay anything," his machinations gave the opposite result.
 {¶ 44} Quick did not inform Hill that she would be selling her house. He gave her the deceptively benign explanation that "they were going to take [the house] out of [her] name." Although he was found not guilty of forgery, both Hill and Loney testified that they did not sign their names on the purchase agreement and had no idea that the house had been the subject of a sale. Loney also testified that Quick filled out a loan application that vastly overstated her income.
 {¶ 45} After the sale of Hill's house, Quick insisted that she sign over to him the proceeds from the sale. By depositing and then spending the bulk of *Page 20 
Hill's equity, it became clear that Quick was not "holding" any money for Hill as he represented. Quick's argument that he used Hill's equity as collateral for a lease is unbelievable because he had no legal obligation on the loan taken out in Loney's name. In fact, Loney testified that she alone made the mortgage payments, even after Hill stopped paying rent on the house. When Hill stopped paying rent to Loney, Quick ordered Hill to vacate the premises. At no time did he use any funds he represented that he was "holding" to pay Loney or assist Hill.
 {¶ 46} The state offered a credible theory that Quick and Cicerchi used Hill's sale proceeds to fund their purchase of a bar. The bank statements for Quick Search, Inc. showed that Quick deposited Hill's settlement proceeds into its account. The following day, he made out a $25,000 check to "cash." The former owner of the bar that Quick and Cicerchi purchased identified a document that memorialized the sale, including Quick and Cicerchi's obligation to make two payments of $22,500. It was a reasonable inference that Quick used the deposited proceeds of Hill's equity to make a payment on the bar. Further proof existed in a check drawn on the Quick Search, Inc. account that showed a payment to a national brewery, thus substantiating the state's theory that the stolen equity had been used to fund the bar.
 {¶ 47} Quick's rationalizations for his actions were not worthy of belief. His claims of altruism were contradicted by his decision to take Hill's equity. He *Page 21 
may have arranged for Hill to remain in her house on a temporary basis, but he did so at the expense of her equity in the house while at the same time duping Loney into buying the house and forcing her to make payments. In all respects, the jury was entitled to conclude that Quick engaged in a classic case of mortgage rescue fraud.
 III {¶ 48} The third assignment complains that trial counsel was ineffective because he failed to introduce into evidence a copy of the lease agreement signed between Loney and Hill. The existence of the lease agreement surfaced in a presentence investigation report and it allegedly contained a "buy back" provision that Quick maintains would have proven that Hill misrepresented the extent of her knowledge concerning the sale of her house.
 {¶ 49} A claim of ineffective assistance of counsel requires a defendant to show that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. Strickland v. Washington (1984),466 U.S. 668. This requires two distinct lines of inquiry. First, we determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client[.]" State v.Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. When making this inquiry, we presume that licensed counsel has performed in an ethical and competent *Page 22 
manner. Vaughn v. Maxwell (1965), 2 Ohio St.2d 299. Second, we determine whether "the defense was prejudiced by counsel's ineffectiveness."Bradley, 42 Ohio St.3d at paragraph two of the syllabus. Prejudice requires a showing to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at paragraph three of the syllabus.
 {¶ 50} Our review of claims of ineffective assistance of counsel is undertaken with the understanding that we are not in a position to second-guess trial counsel. In Strickland, the United States Supreme Court stated, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland,466 U.S. at 689. Debatable trial tactics will not form a basis for proving ineffective assistance of counsel. State v. Hoffner, 102 Ohio St.3d 358,2004-Ohio-3430, ¶ 45.
 {¶ 51} During sentencing, defense counsel told the court:
 {¶ 52} "I would state parenthetically that I believe that the prosecutor, I don't know if he's telling you all that he knows when he says that [Hill] called him, but he surely didn't tell you that [Hill] provided through one way or another a copy of the lease agreement, which she denied existed on the stand, to my *Page 23 
client, and that was subsequently sent to the PSI people and it's attached to the PSI.
 {¶ 53} "The lease agreement clearly shows there is a buy back provision on the back two pages which she signed, a Lease to Purchase Option Agreement signed by [Hill], signed by Sammy Quick. * * *"
 {¶ 54} Cicerchi's attorney likewise mentioned that "there is a lease which is attached to Mr. Quick's presentence report * * *."
 {¶ 55} The presentence report is not a part of the record on appeal. The absence of the lease from the trial record makes it impossible for us to review its content and determine its applicability. "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus.
 {¶ 56} Even if we were to assume that the statement existed, on the record before us there is no indication that defense counsel knew of the lease agreement during trial such that it could have been introduced into evidence. The quoted excerpts from the record suggest that defense counsel first learned of the existence of the lease during sentencing, when the parties were able to review the presentence investigation report. That being the case, defense counsel could not have introduced the lease agreement into evidence during trial, and could not have violated an essential duty to Quick. *Page 24 
 IV {¶ 57} Finally, Quick argues that the court erred by ordering both him and Cicerchi to pay restitution to Hill in the amount of $56,212. He maintains that this amounts to a double recovery for Hill and that she offered no evidence of this amount as economic damages.
 {¶ 58} R.C. 2929.18(A)(1) allows the court to sentence an offender to a financial sanction, including restitution. Restitution must be "in an amount based on the victim's economic loss." If the court decides to impose restitution, it "shall hold a hearing on restitution if the offender, victim or survivor disputes the amount." Id. Before imposing a financial sanction under R.C. 2929.18, the court must consider the offender's present and future ability to pay the amount of the sanction or fine. See R.C. 2929.19(B)(6). We review an order of restitution for an abuse of discretion. State v. Marbury (1995), 104 Ohio App.3d 179,181.
 {¶ 59} After the court ordered that Quick and Cicerchi each pay restitution in the amount of $56,212, Cicerchi's counsel asked the court for "clarification" on the amount, noting that it totaled in excess of $112,000. The court replied, "I look at [sic] they both owe her, they both participated. To the extent they were not severally liable, whether it's legal or not, I don't know, but they're both responsible for the full amount." When counsel stated that he wanted to be sure that "they didn't go over $56,000," the court engaged in a soliloquy in which it blamed the "situation" (apparently referring to the mortgage crisis) on the *Page 25 
banking industry, but did not address the request for clarification on the amount of restitution.
 {¶ 60} We agree with Quick that, were both he and Cicerchi to make full restitution of $56,212 as ordered, Hill would be compensated double her stated economic loss. In so concluding, we reject the state's argument that the court merely imposed joint and several liability, treating Quick and Cicerchi as both being at fault for perpetrating the mortgage rescue scheme. The court's remarks suggest that it imposed a double recovery for Hill's economic loss as shown by its statement that "they're both responsible for the full amount." Under other circumstances, we might read this statement as indicating the court's desire to impose joint and several liability. However, the court's sentencing entry does not make it plain that it imposed joint and several liability up to $56,212 for Hill's economic loss. Instead, the entries require both Quick and Cicerchi to pay $56,212 each, without regard to whether their combined payments would exceed Hill's economic loss. It may be that Quick and Cicerchi engaged in conduct that caused a single, indivisible harm to Hill; if so, the court's restitution order should reflect that reality without creating an economic windfall to Hill.
 {¶ 61} We also find that the court should have conducted a hearing on the actual amount of economic loss suffered by Hill. The amount of restitution must be established to a reasonable degree of certainty through competent, credible evidence. State v. Warner (1990),55 Ohio St.3d 31, 69, Throughout trial, Quick *Page 26 
argued that Hill had recovered some of the equity in the house as shown by her testimony that Quick gave her $4,500 immediately after she signed the settlement proceeds over to him. While that testimony did not serve to obviate the theft counts, it did suggest that Hill's actual economic loss may have been less than the $56,212 face amount of the settlement proceeds check she signed over to Quick. The state's Exhibit 21 was a list prepared by Hill memorializing funds that she received from Quick. It is unclear whether those funds were solely derived from monies Quick obtained from Hill, but there appears to be no factual dispute that the $4,500 Hill received from Quick came from the proceeds of Hill's cashed settlement check. A dispute exists over the actual amount of restitution owed sufficient to require the court to hold a hearing on the matter. See R.C. 2929.18(A)(1).
 {¶ 62} We therefore conclude that the court abused its discretion by failing to ensure that the total amount of restitution ordered did not exceed Hill's economic loss. We sustain the fourth assignment of error and remand with instructions for the court to conduct a hearing to determine the proper amount of restitution.
 {¶ 63} Judgment affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
It is ordered that the parties bear their own costs herein taxed.
The court finds there were reasonable grounds for this appeal. *Page 27 
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA ANN BLACKMON, P.J., and LARRY A. JONES, J., CONCUR
[1] A "foreclosure rescue scheme" is a type of fraud that takes advantage of homeowners who have fallen behind on their mortgage payments. It takes several forms, but as alleged in this case, it begins when the fraud perpetrator proposes to assist a homeowner in foreclosure with promises of paying off a delinquent mortgage and helping the homeowner to stay in the property. The homeowner is convinced to transfer the title of the house to an "investor" as collateral and the investor promises that the homeowner can continue to live in the home and repurchase it later upon reestablishing credit. Upon closing, the proceeds are used to pay off the defaulted loan, the homeowner walks away with nothing and the investor pockets the equity. At some point, the homeowner is evicted, losing the house and all equity. See, generally, Tripoli Renuart (2005), Dreams Foreclosed: The Rampant Theft of Americans' Homes Through Equity-Stripping Foreclosure "Rescue" Scams, available athttp://www.consumerlaw.org/news/ForeclosureReportFinal.pdf; Comment: Closing the Door on Unfair Foreclosure Practices in Colorado (2003), 74 U.Col. L.Rev. 241, 248-250.
[2] Loney pleaded guilty to a misdemeanor count of unauthorized use of a computer or property for her part in the foreclosure rescue scheme. As part of the plea, she agreed to "testify truthfully" against Quick and Cicerchi.
[3] During closing argument, the state argued that Quick "deceived Novastar to execute documents to dispose of its loan proceeds, $142,500." The only document admitted into evidence that reasonably encompasses this argument is a receipt issued by the title company memorializing a wire transfer of $140,699.31 from Novastar. This receipt was neither issued nor executed by Novastar, so it is not evidence that could prove the charge of securing writings by deception. *Page 1