The STATE of Ohio, Appellee,

v.

CICERCHI, Appellant.

[Cite as *State v. Cicerchi,* 182 Ohio App.3d 753, 2009-Ohio-2249.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 91118.

Decided May 14, 2009.

See also, *State v. Quick,* 2009 WL 1244155.

754

756

William D. Mason, Cuyahoga County Prosecuting Attorney, and Michael E. Jackson, Assistant Prosecuting Attorney, for appellee.

Mary Elaine Hall, for appellant.

LARRY A. JONES, Judge.

{¶ 1} Defendant-appellant, Brian Cicerchi, appeals his conviction. Finding some merit to the appeal, we affirm his conviction in part, reverse in part, and remand the case for a hearing on restitution.

{¶ 2} In 2005, Cicerchi was charged with two counts each of forgery and theft and one count of securing writings by deception, mortgage broker prohibition, telecommunications fraud, and falsification. The charges arose out of Cicerchi's participation in a foreclosure-rescue scam. Foreclosure-rescue scams, also known as mortgage-rescue schemes, take various forms. Scam artists have begun to take advantage of the recent and dramatic increase in home foreclosures by using different methods to defraud vulnerable homeowners.

{¶ 3} One all-too common scam occurs when an individual or company identifies an at-risk homeowner and misleads the homeowner into a "temporary" transfer

of the deed to a third party with good credit. The third party then purchases the property and "leases" it back to the homeowner. The scammer convinces the homeowners that they can "refinance" their home using the third party's good credit. The homeowners are led to believe that they will pay "rent" on the home, and once their credit is rehabilitated, they will get the title to their house back. The homeowners then lose title to their homes, while the perpetrator profits by remortgaging the property or pocketing fees paid by the homeowner. Rarely do the homeowners ever regain title or receive any benefit from the sale, and often they lose any equity that may have been in their home.[1]

{¶ 4} Cicerchi was charged with Sammy Quick, Lesley Loney, and First Primary Mortgage, the company Cicerchi and Quick owned. The matter proceeded to a jury trial, in which Cicerchi and Quick were codefendants.[2]

{¶ 5} The following evidence was adduced at trial.

{¶ 6} In June 2005, the Ohio Department of Commerce sent a letter to First Primary Mortgage, informing them that they were no longer licensed to broker mortgages in Ohio because the company did not employ a licensed mortgage broker. Quick, who was listed as the company's vice president, had let his certification expire. Cicerchi, the company's president, had previously applied for a mortgage-broker certification but had never received his license.

{¶ 7} Linda Hill, the victim in this case, lived with her mother. When her mother had to enter a nursing home, she transferred title of her house to Hill so that Hill could take out a mortgage on the house and use the proceeds to pay the nursing home.

{¶ 8} In 2004, Hill entered drug rehabilitation for ten months. During that time, she fell behind on her mortgage payments, and the house went into foreclosure. She found First Primary Mortgage in the phone book and called the company for assistance. The company, through Quick, proposed a plan whereby Hill could save her house and continue to live in it, while at the same time working toward reestablishing her credit.[3]

---

1. See *Johnson v. Wheeler* (D.Md.2007), 492 F.Supp.2d 492, 495–496; see also the Federal Trade Commission's Facts for Consumers, available at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre42.shtm.

2. See *State v. Quick,* Cuyahoga App. No. 91120, 2009-Ohio-2124, 2009 WL 1244155. Lonely pleaded guilty to unauthorized use of property/computer system in violation of R.C. 2913.04 and was sentenced to probation. The criminal case against First Primary Mortgage was dismissed.

3. At the time Hill initially contacted First Primary Mortgage, the company was no longer a licensed mortgage agency.

{¶ 9} Hill testified that when she spoke to Quick on the telephone, he told her that First Primary Mortgage would "take the house out of [her] name" for a period of twelve–to–18 months, and at the end of that time, the house would "go back into [her] name and that [she] would begin to make payments." Quick proposed that during the time that Hill did not have title to the house, she would pay rent to the person who did own title. At no point, Hill testified, did she understand that the mortgage company was proposing that she would actually sell her house, and she believed that she would get her house back after she rehabilitated her credit.

{¶ 10} Quick soon asked Hill to sign some papers, but she did not know what those papers were. She thought that she would be receiving $10,000 to pay off her credit cards as a result of transferring the house, but she received nothing at the time she signed the papers. She also testified that she did not enter into any lease or rental agreement as a result of her arrangement with First Primary Mortgage.

{¶ 11} A month later, Hill began receiving calls from creditors, and she contacted Quick. Quick met her at a bank, gave her a check from the title company in the amount of $56,212.58, and told her to write "pay to the order of" on the check to make it payable to him. He then signed the check, cashed it, and gave Hill $4,500.[4]

{¶ 12} In November 2005, a letter from Novastar Financial addressed to Lesley Loney arrived at Hill's house. Hill opened the letter from Novastar and discovered that the mortgage on her house was $1,300 per month. Hill contacted Novastar and was told that she no longer owned the house she lived in.

{¶ 13} Loney testified that she was Cicerchi's sister and that Cicerchi had approached her and told her that he and Quick had a client who was losing her house and needed help refinancing. She testified, "They wanted me to purchase the home that [Hill] lived in so they could, temporarily, I guess, rent it out, so we could rent it out to her so that she could refinance within a year or so after her credit got better and she got back on her feet." Loney testified that at first she did not agree to the plan, but finally gave in because her brother pressured her. Loney testified that she agreed to the scheme on the condition that Cicerchi take care of collecting a monthly payment from Hill and use that money to pay the mortgage company.

{¶ 14} Loney testified that she never signed a purchase agreement for the house and that the purchase agreement offered into evidence bore a signature

---

4. The evidence shows that at some point, Hill received an additional payment of $3,750; other than those two payments, Hill received no additional money from the sale of her home.

that was not hers and, in fact, misspelled her first name.[5]

{¶ 15} Novastar, the subprime lender that provided the loan to Loney to purchase Hill's house, was unaware that First Primary Mortgage was not properly licensed and began to investigate the loan. Novastar discovered that First Primary Mortgage had arranged for the sale of Hill's house without her knowledge. A Novastar investigator testified that First Primary Mortgage submitted a loan application signed by Loney and Quick, requesting a loan in the amount of $142,500. The investigator also testified that Loney indicated on the loan application that she would use the house as her primary residence. The investigator testified that Novastar considered the information provided by First Primary Mortgage and Loney fraudulent because Novastar would have charged a higher interest rate for property used for investment purposes. Finally, the investigator testified that she spoke with Quick, who told her that he had given the $56,212 check to Hill.

{¶ 16} The purchase agreement for the sale of Hill's house listed a sale price of $150,000, and after deductions for a downpayment on the mortgage and certain expenses, Novastar issued a check payable to Hill in the amount of $56,212.58.[6] Loney testified that she signed certain closing documents, but discovered the selling price of the house only after police became involved. Loney also acknowledged that she signed the mortgage agreement, having represented that the property would be used as a primary residence, even though she had no intention of living there and that she inflated her stated income on the loan application.

{¶ 17} Loney testified that less than one year after signing the loan documents, she began receiving notices that the mortgage payments were late, so she began making the payments. She testified that she never received rent payments from Hill. Hill testified that she was surprised to receive two eviction notices from Quick because she thought she still owned the house.

{¶ 18} During trial, the state provided evidence that Cicerchi and Quick used Hill's money to purchase a tavern. The seller of the bar testified that he sold his business to the two men in August 2005, which was one month after First Primary Mortgage created the purchase agreement for Hill's house. Quick's banking records showed that on the same day Hill received the settlement proceeds on her original loan and signed the check over to Quick, he deposited $51,712 into an account in the name of "Search Quick Inc." In a two-month

---

5. A handwriting expert testified that the alleged signatures of Loney and Hill on the purchase agreement were most likely forged.

6. That amount represented the equity Hill had remaining in her mother's house. Again, Quick had Hill sign the check over to him, and it appears as though Hill received only $8,250 of the $52,212 owed to her.

period, Quick wrote checks to "cash" in the amount of $46,435 and also wrote a check to a beer supplier.

{¶ 19} Cicerchi was convicted of theft, securing records by deception, and telecommunications fraud. The trial court sentenced Cicerchi to six months in jail with five months suspended, five years of community-control sanctions, and ordered Cicerchi to complete community service, pay restitution in the amount of $56,212, and to have no employment in the banking, mortgage lending, consumer lending, or financing business.

{¶ 20} Cicerchi appeals his conviction, raising four assignments of error for our review.

### Ineffective Assistance of Counsel

{¶ 21} In the first assignment of error, Cicerchi argues that he was denied effective assistance of trial counsel.

{¶ 22} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To determine whether counsel was ineffective, Cicerchi must show that (1) "counsel's performance was deficient," in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's "deficient performance prejudiced the defense" in that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland.*

{¶ 23} In Ohio, a properly licensed attorney is presumed competent. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301, 31 O.O.2d 567, 209 N.E.2d 164. In evaluating whether a petitioner has been denied the effective assistance of counsel, the Ohio Supreme Court held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Hester* (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus.

{¶ 24} When making that evaluation, a court must determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client" and "whether the defense was prejudiced by counsel's ineffectiveness." *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 2 O.O.3d 495, 358 N.E.2d 623; *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905. To show that a defendant has been prejudiced, the defendant must prove "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial

would have been different." *Bradley* at paragraph three of the syllabus; *Strickland*.

{¶ 25} Cicerchi argues that his counsel was ineffective for failing to raise a prima facie case of discrimination during jury selection in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The Equal Protection Clause of the Fourteenth Amendment strictly prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges. Such discrimination is grounds to reverse a conviction returned by a jury tainted with such discrimination. See *Batson*; *State v. White* (1999), 85 Ohio St.3d 433, 436–438, 709 N.E.2d 140, 147–149.

{¶ 26} Once a party raises a *Batson* issue, the court adjudicates the claim in three steps: first, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination; second, the proponent must come forward with a race-neutral explanation for the strike; and third, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination. *Purkett v. Elem* (1995), 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834; *State v. White*, 85 Ohio St.3d at 436, 709 N.E.2d 140. Only if the trial court determines, in its discretion, that the defendant has shown an inference of discrimination, does the burden shift to the prosecution to articulate a race-neutral reason for excluding the prospective jurors. *State v. Tillman* (1997), 119 Ohio App.3d 449, 695 N.E.2d 792.

{¶ 27} In this case, after the jury had already been impaneled, the trial court made an off-hand comment that the state had used three of its four peremptory challenges to dismiss African–American jurors. Quick's counsel then alleged that the state "was trying to get a white jury." Cicerchi now argues that his counsel was ineffective for failing to raise a *Batson* challenge when the state dismissed three African–American jurors. A review of the transcript, however, shows no improper actions by the state. As the Ohio Supreme Court stated in *Hicks v. Westinghouse Materials Co.* (1997), 78 Ohio St.3d 95, 100, 676 N.E.2d 872, there was no "pattern of strikes" against African–American jurors, nor did the state make any statements during voir dire that were reflective of a discriminatory motive. Moreover, the final jury included three African–American jurors. Therefore, we conclude that there was no substantial violation of defense counsel's essential duties to his client, nor any showing that Cicerchi was prejudiced by this counsel's failure to raise a *Batson* claim. Thus, we decline to find that Cicerchi's counsel was ineffective for failing to raise a *Batson* challenge.

{¶ 28} The first assignment of error is overruled.

Restitution

{¶ 29} In the second and third assignments of error, Cicerchi challenges the trial court's decision to order him to pay restitution to Hill.

{¶ 30} First, Cicerchi argues that the trial court erred in ordering him to pay restitution in violation of *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824.

{¶ 31} In *Saxon*, the Ohio Supreme Court rejected the "sentencing package doctrine." That doctrine had required courts to consider the sanctions imposed on multiple offenses as the components of a single, comprehensive sentencing plan. Id.

{¶ 32} In this case, Cicerchi argues that the trial court improperly "bundled" the restitution award by considering counts on which he was acquitted along with the counts on which he was convicted. We find *Saxon* inapplicable to this case. Moreover, we find no evidence that the trial court improperly considered those counts on which Cicerchi was found not guilty.

{¶ 33} Next, Cicerchi argues that his counsel was ineffective for failing to object to the amount of restitution. During sentencing, the trial court ordered Cicerchi to pay Hill restitution in the amount of $56,212. Cicerchi argues that this was error because he was acquitted of the theft charge in relation to Hill. Thus, we must review whether Cicerchi can demonstrate a reasonable probability that but for counsel's failure to object to the amount of restitution, his sentence would have been otherwise.

{¶ 34} R.C. 2929.18(A)(1) allows the court to sentence an offender to a financial sanction, including restitution. Restitution must be "in an amount based on the victim's economic loss." If the court decides to impose restitution, it "shall hold a hearing on restitution if the offender, victim or survivor disputes the amount." Id. Before imposing a financial sanction under R.C. 2929.18, the court must consider the offender's present and future ability to pay the amount of the sanction or fine. See R.C. 2929.19(B)(6). We review an order of restitution for an abuse of discretion. *State v. Marbury* (1995), 104 Ohio App.3d 179, 181, 661 N.E.2d 271.

{¶ 35} Although Cicerchi was acquitted of theft, we find persuasive the state's argument that he can be ordered to pay restitution because he was convicted of telecommunications fraud based on his transmittal of Loney's fraudulent loan application to Novastar. As a result, Cicerchi caused Novastar to fund a loan by relying on false information, a portion of the loan proceeds were made payable to Hill, and his partner convinced Hill to sign the loan proceeds over to him. As a result, Hill lost her home. While Cicerchi was acquitted of

one count of theft with Hill as the named victim, both he and Quick performed separate illegal acts to carry out their scheme; thus, we find that Hill suffered an economic loss as a result of Cicerchi's commission of telecommunications fraud.[7]

{¶ 36} That being said, we must still review whether the restitution order was properly made. In this case, after the court ordered that Quick and Cicerchi each pay restitution in the amount of $56,212, Cicerchi's counsel asked the court for clarification on the amount, noting that it totaled in excess of $112,000. The court replied that both Cicerchi and Quick participated in the crimes; thus, they were both responsible for the full amount. The court's sentencing entry, however, does not make it plain that it imposed joint liability up to $56,212 for Hill's economic loss. Instead, the entries require both Cicerchi and Quick to pay $56,212 each, without regard to whether their combined payments would exceed the victim's economic loss. If both Cicerchi and Quick were ordered to make full restitution of $56,212, Hill would receive double the compensation of her stated economic loss.

{¶ 37} We further find that the court should have conducted a hearing on the actual amount of economic loss suffered by Hill. The amount of restitution must be established to a reasonable degree of certainty through competent, credible evidence. *State v. Warner* (1990), 55 Ohio St.3d 31, 69, 564 N.E.2d 18. Throughout trial, counsels for Cicerchi and Quick argued that the victim had recovered some of the equity in the house as evidenced by testimony that Quick gave Hill $4,500 immediately after she signed the settlement proceeds over to him, and later another payment of $3,750; that testimony may serve to show that Hill's actual economic loss was less than $56,212.[8] Thus, we find that a dispute exists over the actual amount of restitution owed sufficient to require the court to hold a hearing on the matter. See R.C. 2929.18(A)(1).

{¶ 38} In conclusion, we overrule the second assignment of error challenging the restitution award based on *Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824. Although we do not find that trial counsel was ineffective, we sustain the third assignment of error in part and remand with instructions for the court to conduct a hearing to determine the proper amount of restitution.

---

7. The indictment does not list a named victim for the telecommunications fraud, but Ohio law does not require that a victim be named in an indictment when the identity of the victim is not an essential element of the crime. *State v. Johnson,* Cuyahoga App. Nos. 81692 and 81693, 2003-Ohio-3241, 2003 WL 21419631. In fact, the state could have argued that Loney was also a victim of the telecommunications fraud since she testified that she made the mortgage payments on Hill's house.

8. This court recognizes that there is no compensation available for the certain emotional loss of one's home to scam artists.

### Sufficiency of the Evidence

{¶ 39} In the fourth assignment of error, Cicerchi argues that the evidence was insufficient to sustain his convictions for theft, securing writings by deception, and telecommunications fraud.

{¶ 40} First, we note that Cicerchi's arguments are set forth in conclusory form, with no citation of statute or authority. Thus, because this assignment has not been independently argued as required by App.R. 16(A)(7), we have the discretion to disregard this assignment of error.[9] We have chosen, however, to briefly review Cicerchi's claims.

{¶ 41} First, Cicerchi was convicted of misdemeanor theft, in violation of R.C. 2913.02(A)(3). The trial court sentenced him on the theft count separately from the other two counts. The court sentenced him to six months in prison and suspended five of those months. It is well settled that when a defendant who has been convicted of a misdemeanor offense voluntarily completes his sentence for that offense, "an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction." *State v. Wilson* (1975), 41 Ohio St.2d 236, 70 O.O.2d 431, 325 N.E.2d 236, syllabus; see also *State v. Golston* (1994), 71 Ohio St.3d 224, 643 N.E.2d 109.

{¶ 42} Thus, in reviewing misdemeanor convictions, we have held that "unless one convicted of a misdemeanor seeks to stay the sentence imposed pending appeal or otherwise involuntarily serves or satisfies it, the case will be dismissed as moot unless the defendant can demonstrate a particular civil disability or loss of civil rights specific to him arising from the conviction." *Cleveland v. Martin* (Apr. 11, 2002), Cuyahoga App. No. 79896, 2002 WL 568302, *3. See also *Cleveland v. Pavlick*, Cuyahoga App. No. 91232, 2008-Ohio-6164, 2008 WL 5050133.

{¶ 43} In this case, Cicerchi has completely served and satisfied the sentence imposed pursuant to his misdemeanor conviction and was not fined or ordered to pay restitution in regard to his theft conviction. Thus, there is no further ongoing or future penalty from which this court can grant relief. Moreover, Cicerchi's brief is devoid of any assertions of a civil disability or loss of civil rights that he will allegedly suffer as a result of the conviction. Therefore, we will

---

9. App.R. 16(A)(7) requires the brief of the appellant to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Cicerchi does no more than quote portions of the transcript under this assignment of error.

review only his challenge to the convictions for telecommunications fraud and securing writings by deception.

{¶ 44} The standard of review for the sufficiency of evidence is set forth in *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus, which states:

{¶ 45} "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." See also *State v. Davis* (1988), 49 Ohio App.3d 109, 113, 550 N.E.2d 966.

{¶ 46} *Bridgeman* must be interpreted in light of the sufficiency test outlined in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, and *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. *Thompkins.* On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus.

{¶ 47} Cicerchi was convicted of telecommunications fraud, in violation of R.C. 2913.05, which states:

{¶ 48} "No person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."

{¶ 49} Viewing the evidence in a light most favorable to the state, we find that a rational jury could have concluded that the state produced sufficient evidence to prove all the essential elements of telecommunications fraud. Proof of guilt may be made by real evidence, circumstantial evidence, and direct or testimonial evidence, or any combination of the three, and all three have equal probative value. *State v. Nicely* (1988), 39 Ohio St.3d 147, 529 N.E.2d 1236. In this case, the state showed that Cicerchi engaged in a foreclosure-rescue scheme to steal the equity in Hill's house and turn her into a tenant in the home she once owned. Cicerchi's involvement was evidenced by Loney's testimony that he pressured her into taking part in the scheme. Cicerchi's company, First Primary Mortgage, prepared the fraudulent loan documents and faxed them to Novastar.

In turn, Novastar relied on the information provided by First Primary Mortgage in drawing up loan-application papers for Loney. Further, Cicerchi knew or should have known that his company was not properly licensed and did not employ a licensed mortgage broker. Therefore, the state provided sufficient evidence of the crime of telecommunications fraud.

{¶ 50} We cannot, however, conclude the same about the securing-writings-by-deception count. Securing writings by deception, in violation of R.C. 2913.43, states that "[n]o person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred." As is pertinent to this case, R.C. 2913.01(A) defines "deception" as "knowingly deceiving another or causing another to be deceived by any false or misleading misrepresentation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(F) defines a writing as "any computer software, document, letter, memorandum, note, paper, plate, data, film, or other thing having in or upon it any written, typewritten, or printed matter, and any token, stamp, seal, credit card, badge, trademark, label, or other symbol of value, right, privilege, license, or identification."

{¶ 51} At trial, the state argued that First Primary Mortgage deceived Novastar into executing a writing that provided the loan proceeds to Loney. The state's theory was that Cicerchi and Quick deceived Novastar into executing documents that caused it to dispose of its loan proceeds in the amount of $142,000. The state, however, did not produce the "writing" that Novastar executed. The only evidence of the loan was a receipt issued by the title company, which was not executed by Novastar. Simply put, the actual loan-agreement document was never admitted into evidence.[10]

{¶ 52} Although Evid.R. 803(6) permits introduction of records of regularly conducted activity, that exception concerns the introduction of the documents themselves, not oral testimony such as the witness for Novastar gave. "There is no hearsay exception that allows a witness to testify to the contents of business records, in lieu of providing and authenticating the records in question." *Hayes v. Cleveland Pneumatic Co.* (1993), 92 Ohio App.3d 36, 44, 634 N.E.2d 228, citing *St. Paul Fire & Marine Ins. Co. v. Ohio Fast Freight Inc.* (1982), 8 Ohio App.3d 155, 8 OBR 213, 456 N.E.2d 551. That being said, the state even failed to provide witness testimony regarding the content of the loan.

---

10. The only documents introduced at trial in relation to Novastar were the loan application and a borrower's certification, but Novastar did not execute either of those writings.

{¶ 53} Evid.R. 1002 requires the state to offer the actual writing into evidence because the state was attempting to prove the content of the writing.[11] Although it is undisputed that Novastar did loan money to Loney, the actual "writing" memorializing that loan is an essential element of the offense of securing writings by deception, which had to be proven beyond a reasonable doubt. As it stands, the record shows no evidence, other than the investigator's statement that Novastar loaned Loney money, of any writing executed by Novastar. We conclude that the state's failure to introduce the actual writing executed by Novastar is fatal to the charge of securing writings by deception.

{¶ 54} Therefore, the fourth assignment of error is sustained in part and overruled in part.

{¶ 55} Accordingly, the judgment is affirmed in part and reversed in part. The conviction for securing writings by deception is vacated, and we remand the cause for hearing on restitution.

Judgment accordingly.

BLACKMON, P.J., concurs.

STEWART, J., concurs in part and dissents in part.

MELODY J. STEWART, Judge, concurring in part and dissenting in part.

{¶ 56} I concur with the majority in all but the affirmation of the restitution order. I would vacate the court's order of restitution with regard to Cicerchi given his acquittal on the theft count directly related to Hill.

{¶ 57} The purpose of restitution is to compensate a victim of a crime, so it must be limited to the actual economic loss caused by the illegal conduct for which the defendant was convicted. *State v. Hooks* (2000), 135 Ohio App.3d 746, 748, 735 N.E.2d 523, citing *State v. Brumback* (1996), 109 Ohio App.3d 65, 82, 671 N.E.2d 1064. It follows that "restitution can be ordered only for those acts that constitute the crime for which the defendant was convicted and sentenced." *Hooks* at 748, 735 N.E.2d 523; *State v. Friend* (1990), 68 Ohio App.3d 241, 243, 587 N.E.2d 975. Absent Cicerchi's actual conviction for the theft of Hill's equity, there is no legal basis for making him pay restitution to compensate Hill.

---

11. Evid.R. 1002 states that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required * * *."