[Cite as *State v. Claggett*, 2020-Ohio-4133.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                                       No. 108742

    v.                             :

LAWRENCE C. CLAGGETT,                     :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 20, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-632751-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lindsay Raskin, Assistant Prosecuting Attorney, *for appellee.*

Brian R. McGraw, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} In this delayed appeal, defendant-appellant, Lawrence C. Claggett, appeals his convictions and the trial court's calculation of jail-time credit. For the reasons that follow, we affirm.

{¶ 2} In September 2018, Claggett was named in a five-count indictment charging him with aggravated robbery (Count 1), three counts of robbery (Counts 2, 3, and 4), and theft (Count 5). Counts 1, 2, and 3 each contained notices of prior conviction and repeat violent offender specifications. The trial court considered the following evidence during a bench trial.

{¶ 3} On January 12, 2017, two masked men robbed a Citizens Bank in Euclid, Ohio. The state introduced and played the surveillance video taken from inside the bank.

{¶ 4} Ashleigh Perkins, a bank employee, testified that she was standing with a coworker when she heard someone yell "everybody get the f*** down." (Tr. 53.) She said that she saw a male run into the bank and spray something in the security guard's eyes. Perkins testified that she heard the security guard yell, "You guys are being robbed." (Tr. 54.) She saw the other male jump over the teller counter and try to access the teller drawers. Perkins stated that she heard the male who jumped over the counter shout to the other male who was waiting in the lobby that some of the teller drawers were locked. According to Perkins, the male then yelled "Dude, let's get the f*** out." (Tr. 56.) After the men left, she noticed an unfamiliar black bag by her workstation. She described the male who left the bag as being approximately her height — five-foot and three inches, and having a slender build. Perkins described how she felt "terrified, and that she was afraid to move because at one point, the male ransacking the teller drawers was standing right in

front of her as she was crouched underneath her desk. She testified that $2,650 was taken from her cash drawer.

{¶ 5} Another bank employee, Jacqueline Wroblewski, testified that she was working in the bank when she heard a commotion by the door. She said that she saw someone in the doorway pointing what she believed to be a gun toward everyone while yelling "be quiet." (Tr. 39.) She said she was "terrified" and immediately dropped to the ground and closed her eyes, but she could hear two men yelling back and forth at each other while one rummaged through the teller drawers behind the counter.

{¶ 6} Theresa Conkey, a bank teller at the bank, testified that she was assisting a customer when the security guard alerted them that they were "being robbed." She got down on the ground and could hear someone shuffling through the drawers, including her teller drawer. Conkey testified that she felt like she could not leave and was concerned about what was going to happen and for her coworkers. She stated $1,596 was taken from her teller drawer.

{¶ 7} Officer Greg Costello from the Euclid police department testified that he collected into evidence the black bag and discovered inside the bag a tinfoil-wrapped concrete rock. Claggett's DNA attributed to 94 percent of the mixture DNA evidence taken from the handle of the black bag. According to Andrea Dennis, a forensic analyst for the Ohio Bureau of Criminal Investigation, the DNA match was rarer than one in one trillion, the highest possible match that her agency can report. Dennis also analyzed DNA evidence taken from the concrete block found inside the

black bag the men left behind. According to Dennis, the DNA profile was from a single-source contributor and matched the DNA of Claggett. Again, the match was rarer than one in one trillion.

{¶ 8} Dan Richard, special agent with the FBI testified about his involvement with the robbery investigation. He testified that he reviewed surveillance video from the bank and confirmed that the individual who carried the black bag into the bank and pepper sprayed the security guard stood approximately five-foot five inches and had a slim build. Special Agent Richard stated that he participated in the interview with Claggett and Euclid police detective, Michael Caruso, and subsequently assisted with obtaining a federal warrant for Claggett's phone records.

{¶ 9} Detective Caruso testified that he was assigned to investigate the robbery. At trial, he identified the photographs taken of the crime scene, including photographs of the security guard after he had been pepper sprayed and of pepper-spray "splash-over" located on the bank's doorway. Detective Caruso also testified about the events recorded on the surveillance video. He described that a shorter male carrying a black bag entered the bank and immediately pepper-sprayed the security guard, causing the guard to drop to his knees. Additionally, he stated that the same male was holding the black bag in the vicinity where the bag was recovered.

{¶ 10} After learning that the DNA taken from the black bag and concrete rock preliminarily matched that of Claggett, Detective Caruso contacted the FBI and learned that Claggett was on federal parole for prior bank robberies. Based on a

search through Ohio Law Enforcement Gateway database ("OHLEG"), he learned that Claggett is approximately five-foot and five inches tall and weighs 135 pounds.

{¶ 11} As a result of the information identifying Claggett as a suspect, Detective Caruso consulted with the FBI and developed a plan to obtain Claggett's cell phone records. He testified that based on the cell phone records, he learned that the location service feature on Claggett's cell phone was disabled from 9 a.m. on the day of the bank robbery until 6 a.m. the following day. However, what he found significant was that the day before the robbery, Claggett's cell phone pinged off a tower near the Citizens Bank in Euclid.

{¶ 12} Based on this information, Detective Caruso and Special Agent Richard coordinated with Claggett's federal parole officer an opportunity to meet with Claggett. Following Claggett's scheduled parole report, the officers met with Claggett to discuss the bank robbery. During the interview, Claggett denied having been in Euclid around the time of the robbery. Later, after receiving the report on the full DNA assessment, Detective Caruso and Special Agent Richard accompanied Claggett's federal parole officer to Claggett's home for a previously scheduled visit; however, he was not there. At that point, Claggett's parole officer considered him "AWOL." After 16 months and with the assistance of the United States Marshalls, Claggett was arrested on the outstanding parole violation warrant and the warrant issued for the Citizens Bank robbery.

{¶ 13} Following the state's presentation of the evidence, the state dismissed Count 1, aggravated robbery. The trial court found Claggett not guilty of Count 2,

but guilty of robbery as charged in Counts 3 and 4, and theft as charged in Count 5. The parties agreed that all counts merged for sentencing purposes, and the state elected that the court sentence Claggett on Count 3. The trial court imposed a sentence of five years in prison.

{¶ 14} Claggett now appeals, raising two assignments of error.

## I. Sufficiency and Manifest Weight of the Evidence

{¶ 15} In his first assignment of error, Claggett contends the evidence was insufficient to support his convictions, and that his convictions are against the manifest weight of the evidence.[1]

{¶ 16} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable

---

[1] This court recognizes that the concepts of a conviction as being against the manifest weight of the evidence, and as being supported by insufficient evidence are distinct, both quantitatively and qualitatively different, and must be reviewed under different standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. In this appeal, although Claggett set forth the legal standards for both sufficiency and manifest weight, he did not make separate identifiable arguments under each standard in violation of App.R. 16(A).

to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."' *State v. Walker*, 150 Ohio St. 3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 17} On the other hand, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden* at ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 388. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 18} We need not address the finding of guilt as to the robbery and theft offenses in Counts 4 and 5 because those offenses merged with the robbery offense in Count 3, and the state elected that the court sentence Claggett on Count 3. *State v. Rosa*, 8th Dist. Cuyahoga No. 108051, 2019-Ohio-4888, ¶ 26, fn. 1, citing *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 (when counts in an indictment are allied offenses and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless); *see also State v. McFarland*, Slip Opinion No. 2020-Ohio-3343, ¶ 25, fn. 1.

{¶ 19} In Count 3, Claggett was convicted of robbery in violation of R.C. 2911.02(A)(2), which provides that "no person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * inflict, attempt to inflict, or threaten to inflict physical harm on another." The indictment specified that the victim was Theresa Conkey.

{¶ 20} Claggett contends that his robbery conviction should be reversed because (1) the evidence was insufficient to prove that he was present during the robbery; (2) no force was exerted against the victim named in the indictment; and (3) the testimony regarding force against the security guard is minimal and insufficient to satisfy the harm element. We disagree with each of Claggett's assertions.

{¶ 21} In this case, the evidence proved that Claggett was present and committed the robbery at Citizens Bank. First and most importantly, DNA evidence linked him directly to the black bag and the concrete rock found at the bank after the perpetrators fled the scene. The surveillance video showed that a person matching Claggett's height and weight carried the black bag into the bank on the day of the robbery. Additionally, Claggett's cell phone records revealed that he was in the vicinity of the bank the night before the robbery and that the location services feature on his phone had been turned off the morning of the robbery, yet reactivated the morning after the robbery. Accordingly, we find that the evidence was sufficient that he was present at the time of the robbery.

{¶ 22} Claggett next contends that the state did not present evidence that he caused harm, attempted to cause, or threatened to cause harm to the victim named in the indictment. Therefore, he contends that his robbery conviction is unsupported by the evidence. Although couched as a sufficiency argument, Claggett's argument seems to be that because the indictment identified Theresa Conkey as the named victim, the state was required to prove the same. We disagree.

{¶ 23} A difference between an allegation in an indictment and the evidence presented at trial may be problematic if the difference is in "a matter essential to the charge." *State v. Smith*, 2d Dist. Montgomery No. 24402, 2012-Ohio-734, ¶ 30, citing *State v. Brozich*, 108 Ohio St. 559, 141 N.E. 491 (1923), paragraph one of the syllabus. "Ohio law does not require that a victim be named in an indictment when the identity of the victim is not an essential element of the crime." *State v. Cicerchi*, 182 Ohio App.3d 753, 2009-Ohio-2249, 915 N.E.2d 350, ¶ 35, fn. 7 (8th Dist.). Based on the statutory language of R.C. 2911.02, the identity of the victim is not an essential element to the crime of robbery. Accordingly, the state did not need to prove the harm element as it pertained to the named victim.

{¶ 24} Even if the identity of the victim were essential, Crim.R. 33 and R.C. 2945.83 provide that a conviction may not be reversed because of "[a] variance between the allegations and the proof thereof, unless the defendant is misled or prejudiced thereby." Crim.R. 33(E)(2); R.C. 2945.83(B). In this case, Claggett does not claim that the difference in evidence presented at trial misled or prejudiced him. Accordingly, even if this court found that the evidence was insufficient to prove the

harm element pertaining to the victim named in the indictment, Claggett has failed to demonstrate prejudice.

{¶ 25} Looking at the evidence as a whole, we find that the evidence supports a finding that Claggett caused, attempted to cause, or threatened to cause physical harm when he entered the Citizens Bank with his accomplice to commit the act of robbery. When the men entered the bank, Claggett pepper sprayed the security guard. Additionally, the men shouted for everyone to "shut the f*** up." Jacqueline Wroblewski testified that she saw one of the men pointing what she believed to be a gun at the people inside the bank. Ashleigh Perkins testified that she was "terrified" and "feared for her life." She said that she felt like she "did not take a breath" and that "time stood still." Additionally, Theresa Conkey testified that she was concerned about the situation and for her coworkers. Based on the foregoing, the evidence supports the essential element of harm. *See State v. Vore*, 12th Dist. Warren No. CA2012-07-065, 2014-Ohio-1583 (evidence supports the harm element when the bank teller testified that she froze when the defendant handed her a note and demanded money).

{¶ 26} Additionally, and contrary to Claggett's assertion, the testimony and evidence demonstrating that the security guard was pepper sprayed was significant and more than sufficient to satisfy the harm element for robbery. Detective Caruso testified about the surveillance video showing that when the male entered the bank, he immediately sprayed pepper-spray at the security guard, causing the security guard to fall to his knees. *See State v. Humphrey*, 6th Dist. Lucas No. L-05-1158,

2006-Ohio-4298, ¶ 25 (robbery conviction upheld where defendant struggled with and then pepper sprayed the victim). Accordingly, the fact that Claggett pepper-sprayed the security guard is sufficient to prove the harm element of robbery.

{¶ 27} We further find that the trial court did not lose its way in finding Claggett guilty because, as this court has previously held, "[f]light from justice may be indicative of a consciousness of guilt." *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, citing *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997). In this case, Special Agent Richard testified that following his interview with Claggett about the robbery, Claggett stopped cooperating with his federal parole officer and stopped living at his reported address. Additionally, Detective Caruso testified that he learned from Claggett's federal parole officer that Claggett stopped reporting and was therefore classified as "AWOL." He further testified that an arrest warrant was issued and Claggett was apprehended sixteen months later. Accordingly, Claggett's flight after his initial interview with law enforcement about his involvement with the robbery is indicative of a consciousness of guilt that the trial court could consider in reaching its verdict

{¶ 28} Based on the record before this court, we find that sufficient evidence supports Claggett's conviction, and that this is not the exceptional case where the court lost its way in finding Claggett guilty of robbery. The assignment of error is overruled.

## II. Jail-Time Credit

{¶ 29} In his second assignment of error, Claggett contends that the trial court failed to award him the correct amount of jail-time credit.

{¶ 30} This court reviews the trial court's determination as to the amount of jail-time credit under the "clearly and convincingly" contrary-to-law standard. *State v. Perkins*, 11th Dist. Lake Nos. 2018-L-084 and 2018-L-098, 2019-Ohio-2288, ¶ 12. It is Claggett's burden to establish that the trial court erred in its jail-time award. *State v. Haworth*, 11th Dist. Portage Nos. 2019-P-0047-0049, 2020-Ohio-1341, ¶ 29, citing *State v. Corpening*, 2019-Ohio-4833, 137 N.E.3d 116, ¶ 27 (11th Dist.).

{¶ 31} "Criminal defendants have a right to jail-time credit." *State v. Thompson*, 8th Dist. Cuyahoga No. 102326, 2015-Ohio-3882, ¶ 21. R.C. 2967.191 provides that a prison term shall be reduced "by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced." "Although the [department of rehabilitation and correction] has a mandatory duty pursuant to R.C. 2967.191 to credit an inmate with jail time already served, it is the trial court that makes the factual determination as to the number of days of confinement that a defendant is entitled to have credited toward [his or her] sentence." *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 98 Ohio St.3d 476, 2003-Ohio-2061, 786 N.E.2d 1286, ¶ 7. Time spent in confinement, either prison or jail, for unrelated cases or awaiting trial and sentencing on an unrelated case cannot be counted towards another case. *State v. Cupp*, 156 Ohio St.3d 207, 2018-Ohio-5211, 124 N.E.3d 811, ¶ 23.

{¶ 32} In this case, Claggett did not object to the trial court's calculation of jail-time credit and did not file a motion to correct jail-time credit below. On appeal, however, Claggett summarily contends that he is entitled to at least a credit of 253 days because he was arrested on September 13, 2018, and remained in custody throughout the entire proceedings. In this case, the trial court credited Claggett 192 days of jail-time credit. The record before this court does not reveal how the trial court determined that Claggett was entitled to 192 days of credit.

{¶ 33} In its appellate brief, however, the state contends that on June 20, 2017, the Northern District of Ohio issued a warrant for a federal parole violation. Accordingly, the state contends that because Claggett also had a hold for the federal parole violation, he was not being held solely on this case and should not be afforded the requested jail credit.

{¶ 34} The record before this court tends to support the state's position, and without any evidence to the contrary, we find that Claggett has failed to satisfy his burden of demonstrating that the trial court erred in its jail-time award. During trial, testimony showed that following his interview with law enforcement about the Citizens Bank robbery, Claggett went "AWOL" with his federal parole officer. Additionally, Detective Caruso testified that United States Marshalls apprehended Claggett on an outstanding warrant. Accordingly, the record supports that Claggett was being held at some point for both the federal parole violation and the underlying case. The second assignment of error is overruled.

{¶ 35} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EILEEN T. GALLAGHER, A.J., and
PATRICIA ANN BLACKMON, J., CONCUR