# IN THE SUPREME COURT OF IOWA

No. 21–1319

Submitted December 14, 2023—Filed March 15, 2024
Amended March 26, 2024

**STATE OF IOWA,**

Appellee,

vs.

**DAVID DWIGHT JACKSON,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott J. Beattie (motion to suppress) and David M. Porter (trial), Judges.

The defendant in a vehicular homicide case seeks further review of a court of appeals decision holding that rebuttal evidence of his medical condition was properly admitted over his hearsay objections. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

McDonald, J., delivered the opinion of the court, in which Oxley, McDermott, and May, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which Christensen, C.J., and Waterman, J., joined.

Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

**MᴄDᴏɴᴀʟᴅ, Justice.**

David Jackson was involved in a car accident that killed another motorist. He was convicted of vehicular homicide by operating while intoxicated, reckless driving, leaving the scene of an accident resulting in death, and operating a motor vehicle without the owner's consent. As relevant to this appeal, the primary issue at Jackson's trial was the cause of the accident. The State contended Jackson was operating the vehicle while under the influence of controlled substances. Jackson testified that he blacked out and lost control of the vehicle due to a medical condition. To rebut Jackson's testimony, the State called an employee of a healthcare vendor subcontracted to provide services to the county jail where Jackson had been detained after the car accident. The employee had not treated Jackson, but the employee had reviewed some of Jackson's post-accident medical records that had been transmitted to the jail. Over Jackson's hearsay objection, the district court allowed the employee to testify regarding the statements contained in the post-accident medical records even though the medical records were not offered or admitted into evidence. For the reasons expressed below, we conclude the district court erred in admitting the challenged testimony and the error was not harmless.

I.

Jackson was charged by trial information with homicide by vehicle (operating while under the influence), homicide by vehicle (reckless driving), leaving the scene of an accident resulting in death, theft in the second degree, and operating while under the influence, first offense. *See* Iowa Code §§ 707.6A(1), (2); *id.* § 714.2(2); *id.* § 321.261(4); *id.* § 321J.2(2)(*a*). The case was tried to a jury. The jury found Jackson guilty of homicide by vehicle (operating while under the influence) and guilty of leaving the scene of an accident resulting in death. The jury also found Jackson guilty of the lesser included offenses of

reckless driving and operating a motor vehicle without the owner's consent. *See id.* § 321.277; *id.* § 714.7. The district court sentenced Jackson to a term of incarceration not to exceed twenty-five years.

The trial record reflects the following. In July 2020, Patrick Downey reported his black Toyota Prius had been stolen. A woman renting from him or residing with him, Carrie Halfpop, had relapsed on drugs and had taken his car without his permission. On or about August 9, the Des Moines Police Department contacted Downey and told him that they had recovered his vehicle and that it had been in an accident. The driver of the vehicle at the time of the accident was David Jackson. Downey did not know Jackson, and Downey had not given Jackson permission to drive his vehicle.

Jackson testified that on August 9, he went a couple of doors down to his neighbors and asked to borrow Shelly Smith's car. Jackson testified he needed to borrow the car to run some errands. One of Jackson's errands was to go to Broadlawns Medical Center to get paperwork. Jackson testified that in the weeks prior to August 9, he had blacked out a couple of times. Jackson testified he had COVID-19 and had been quarantined from work. According to Jackson, he needed to get paperwork from Broadlawns to show he had taken a COVID-19 test so he could return to work and get paid for the time he was in quarantine. Smith allowed Jackson to take the vehicle. The vehicle Jackson borrowed from Smith was in fact Downey's stolen Prius. Jackson testified he did not know the car was stolen. He testified he had seen Smith drive the car every day. After the car was recovered, Smith's fingerprints were found in the Prius along with a woman's boot and tampons.

On August 9, Jackson was driving the Prius southbound on Martin Luther King Jr. Parkway in Des Moines near Broadlawns Medical Center. According to another motorist at the scene, the Prius was just "driving down the street" and

"everything was just normal," and then "[a]ll of a sudden," the Prius accelerated and crossed the center lines into the northbound lanes. The Prius collided head-on with a Polaris Slingshot, a three-wheeled vehicle, being driven by Bounleua Lovan, and slammed it into a telephone pole. After the Prius collided with the Slingshot, the Prius jumped the curb, traveled through a parking lot, and kept going until it crashed into a building. The motorist testified he did not "see a brake light or [Jackson] even trying to stop the vehicle." Based on this witness's observation of the Prius, the witness "just assumed worst-case scenario, that it was somebody having, like, a medical problem . . . as they were driving down the street." After seeing the accident, the motorist stopped his vehicle to check on Lovan. When the motorist got close to Lovan, he immediately knew it was not good. Lovan died from injuries sustained in the collision.

Data from the Prius's black box confirmed the eyewitness's account of the Prius's movements immediately preceding and during the accident. The data showed the gas pedal was depressed at a constant level of 68% to 68.5% from five seconds prior to colliding with the Slingshot until the Prius crashed into the building. The data showed the brakes were not applied at any time during the accident. The data showed the driver of the Prius did not jerk the wheel at any point during the accident. The State's expert testified the steering wheel remained at a constant three degrees throughout the incident, which showed the driver had not attempted to "turn right or turn left." In sum, the data showed "the driver was not moving the wheel, changing pedal position, or increasing speed by pushing the pedal down." The State's accident reconstruction expert testified he could not make a "determination that the person was intoxicated and that's what caused this accident." In this case, "there were no indicators, no factors, no reports given to" the expert "that made it possible . . . to come to a conclusion in that regard."

Another motorist at the scene also saw the collision. After witnessing the collision, she drove toward the Prius to see if the driver was okay. A man exited from the driver's side door. He "popped out kind of in a daze . . . just looking around as if he was confused a little bit." When she asked if he was okay, the man replied, "I wasn't in the vehicle. Wasn't driving that vehicle." But there was no one else in the vehicle. She testified the man got back into the vehicle and pulled out a bag. He started walking away from the scene with the bag. The witness called 911 and described the man as he was walking away from the scene. The witness subsequently identified Jackson as the man she had seen.

After Jackson left the crash scene, he walked a few doors down to a nearby senior living facility. He tried to enter the main entrance of the building. Unable to do so, Jackson sat down on a bench in front of the building. Officer Christopher Latcham was dispatched to the scene. Latcham encountered Jackson in front of the senior living facility and began to issue directives to him while holding a can of pepper spray. Jackson initially got on the ground, but he then got up and tried to run away. Latcham pepper-sprayed Jackson. After a short chase in front of the building, Jackson lied down on the ground. He was then placed in handcuffs by another police officer who had arrived at the scene, Officer Nathan Nemmers. Nemmers noticed that Jackson had bloodshot, watery eyes and was sweating profusely. Nemmers thought Jackson could be under the influence of drugs or alcohol. Nemmers did not smell any odor of an alcoholic beverage.

Jackson was transported to Broadlawns for treatment. He was given Ativan to calm him down. Nemmers questioned Jackson at the medical center. According to Nemmers, Jackson was "generally pretty incoherent." Jackson denied having driven, denied knowledge of a collision, and was unable to tell Nemmers what had occurred. Nemmers was unable "to get any coherent

response" from Jackson. Nemmers did not conduct any field sobriety tests at the hospital because Jackson "was incoherent and unable to follow . . . any commands or instructions."

Nemmers applied for a search warrant to take a blood sample from Jackson. The application described the accident and recited Nemmers's observations of Jackson, summarizing them as follows:

> Suspect was incoherent, unaware why he was at the hospital. Suspect was unaware that he had been involved in an accident. Suspect was displaying behavior consistent with drug use including profuse sweating, grinding teeth, and inability to remain still.

The warrant application contained an error. In preparing the search warrant application, Nemmers had modified a previous application form without deleting the information it contained about field sobriety tests. The search warrant application stated Jackson had failed the walk-and-turn and the one-leg-stand tests and had registered a .000 blood alcohol level on the preliminary breath test even though no field sobriety tests had been administered. The district court issued the search warrant.

After Jackson's blood was drawn pursuant to the search warrant, the sample was sent for testing. Jackson's blood tested positive for methamphetamine and amphetamine, at 104 nanograms per milliliter of blood and 16 nanograms per milliliter of blood, respectively. The State's expert testified that methamphetamine and amphetamine can be obtained with a prescription and that both have therapeutic uses. He testified methamphetamine is "often used to treat obesity and narcolepsy and ADHD-type disorders." There was no evidence on whether Jackson had a prescription for these drugs. Regardless, the State's expert testified the level detected was above any therapeutic range. However, the State's expert was unable to say that the levels in Jackson's blood "rendered Mr. Jackson intoxicated by methamphetamine."

Jackson admitted he had taken an ecstasy pill two or three days prior to the accident, but he believed the accident was due to his medical condition and not because he was under the influence. Jackson testified that while he was driving on August 9, he "started to have . . . tightness in [his] chest," and he "passed out, blacked out at the wheel." He "[c]ompletely blacked out at the wheel." His "next memory [was] kind of like a pop, a bang, a loud noise, explosion," and he found himself "sitting in the car" with the airbags deployed. He testified he "was in shock, actually, because [he] didn't know where [he] was at or what had happened." Jackson claimed that he didn't realize he had run into another vehicle. He was in pain and was "trying to remember where [he] was at or what was going on." He testified he saw a lady standing there when he exited the vehicle, but he couldn't hear her or comprehend what she was talking about. He could not recall speaking to her. He was in "a generalized state of confusion at that point." He decided he would try to walk to Broadlawns. He claimed that he mistook the senior living center for the medical center. He testified he could see "people in wheelchairs and a walker," and he opened the front door but could not get through the locked lobby doors. Unable to get into the building, he sat down outside.

In support of his testimony, Jackson attempted to offer into evidence certain medical records from Broadlawns and his employer regarding COVID-19, quarantine, his testing, and his ability to return to work, etc. The prosecutor raised a hearsay objection, among others, to Jackson's proffered exhibits. The prosecutor argued that the "defendant is not the witness to admit medical records." The prosecutor argued that if a "records custodian from Broadlawns was here, that might be an appropriate witness," or the doctor making the record might be an appropriate witness. The district court ruled one of the exhibits could be admitted but the remainder would be excluded due to lack of

foundation, authentication, relevance, and hearsay. The one exhibit that was admitted was an authorization form to disclose health information to allow Broadlawns to release medical records, including lab results for COVID-19, to Jackson's employer. The authorization form was signed by Jackson and dated July 27.

Almost immediately after the State argued to exclude Jackson's medical and employment records on foundation and hearsay grounds, the State sought to introduce testimony about Jackson's post-accident medical records. The State called Dale Peterson, who was employed as the health services administrator of a company called Wellpath. Wellpath was the contracted medical group for the Polk County Jail. As the health services administrator for Wellpath, Peterson oversaw the medical and mental health staff for the Polk County Jail. He was responsible for the medical records of persons in the jail. After Jackson was discharged from Broadlawns following the accident, he was arrested and transported to the Polk County Jail. Peterson testified that Broadlawns sent Jackson's post-accident medical records to the jail. Peterson testified he reviewed the medical records.

Over Jackson's medical privilege, hearsay, and best evidence objections, Peterson was allowed to testify regarding the statements contained in the post-accident medical records and Jackson's medical condition even though the medical records were not offered or admitted into evidence and even though Peterson had no personal knowledge regarding Jackson's medical condition.

> Q. Can you tell us, please, if the defendant -- if his discharge instructions reflected any concerns about his breathing?
>
> A. No, ma'am, they did not.
>
> Q. I didn't ask you very well. I asked you if you could tell us and you said no. Did his records reflect that the defendant had any difficulty with his breathing?

A. No, ma'am.

. . . .

Q. Do the records show, in Mr. Jackson's case, whether or not he had vitals taken while he was at the hospital?

A. Yes, they do.

Q. Do the records reflect what his heart rate was while he was at the hospital?

A. Yes.

Q. What is that?

A. From my understanding of his medical records after reviewing them, vital signs were stable and within normal limits.

. . . .

Q. What was the defendant's oxygen level?

A. 98 percent.

Q. Was there any report provided that the jail medical staff should make observations of the defendant for a history of blacking out?

A. No, ma'am.

Q. A history of losing consciousness?

A. No, ma'am.

The district court overruled Jackson's privilege objection on the ground that the defendant "opened the door . . . during his direct examination." The district court overruled the hearsay objection on the ground that the records either were not being offered for the truth of the matter asserted or involved Jackson's statements of his own medical condition. *See* Iowa R. Evid. 5.803(3) (2021). The district court overruled the best evidence objection on the ground that "[t]his is not the type of testimony the best evidence rule is designed to regulate."

II.

Following the entry of sentence, Jackson filed this appeal. We transferred the case to the court of appeals. Jackson raised three arguments in his main brief on appeal.

Jackson contended that the results of the chemical test of his blood should have been suppressed and not admitted at trial. Prior to trial, Jackson moved to suppress the blood test results on the ground that Nemmers's search warrant application contained false information regarding field sobriety testing. *See Franks v. Delaware,* 438 U.S. 154, 155–56 (1978). Following a hearing, the district court denied the motion to suppress, reasoning that even if the false information were excised from the search warrant application, there was still sufficient information to establish probable cause to issue the warrant. The court of appeals affirmed the district court's denial of the motion to suppress evidence. Like the district court, the court of appeals reasoned that even without the inaccurate information regarding field sobriety tests, "the other information in the [search warrant] affidavit support[ed] a probable cause finding." *See id.* at 171–72.

Jackson next contended that the district court erred in allowing Peterson to testify about the statements contained in Jackson's medical records. Specifically, Jackson contended his medical records and medical information were confidential and privileged pursuant to Iowa Code section 622.10. The court of appeals rejected the argument, concluding that Jackson waived confidentiality and privilege by testifying about his own medical condition and that the State was entitled to rebut Jackson's testimony regarding his medical condition.

Finally, Jackson contended that the district court erred in allowing Peterson's testimony because it violated the rule against hearsay. In the district

court, the State contended Peterson's testimony was not hearsay because it was not offered for the truth of the matter asserted but instead was offered to show the jail's subsequent course of treatment. The district court allowed the testimony on that ground and on the alternative ground that the statements were admissible as statements of then-existing mental, emotional, or physical condition.

In its appeal brief, the State abandoned the position that the testimony was not offered for the truth of the matter asserted and was not hearsay. Instead, the State argued that the testimony was admissible under three exceptions to the rule against hearsay: (1) statements of then-existing mental, emotional, or physical condition, *see* Iowa R. Evid. 5.803(3); (2) statements made for medical diagnosis or treatment, *see id.* r. 5.803(4); and (3) records of regularly conducted activity, also known as the business records exception, *see id.* r. 5.803(6). Even though some of these alternative arguments were not presented to the district court, an appellate court "may affirm a ruling on the admission of evidence by using a different rationale than relied on by the district court." *State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016).

The court of appeals affirmed the district court's admission of the challenged hearsay testimony. The court of appeals rejected the State's argument that Peterson's testimony was admissible as statements of then-existing mental, emotional, or physical condition under rule 5.803(3). The court of appeals reasoned that Peterson's testimony did not recount Jackson's statements about his condition but instead the statements of unknown persons who had observed Jackson. The court of appeals did not address the exception for statements made for purposes of medical diagnosis under rule 5.803(4). The court of appeals agreed with the State's contention that Peterson's testimony about the

statements contained in the medical records was admissible under the business records exception to the rule against hearsay set forth in rule 5.803(6).

### III.

We granted Jackson's application for further review. "On further review, we have the discretion to review any issue raised on appeal." *State v. Mong*, 988 N.W.2d 305, 308 (Iowa 2023) (quoting *State v. Crawford*, 972 N.W.2d 189, 203 (Iowa 2022)). We exercise our discretion and confine our review to the question of whether Peterson's hearsay testimony was admissible under the exceptions to the rule against hearsay set forth in rules of evidence 5.803(4) and 5.803(6). The court of appeals decision is final as to all other issues.

### A.

Hearsay is a statement that "[t]he declarant does not make while testifying at the current trial or hearing" and that is "offer[ed] into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(*c*)(1)–(2). Iowa law prohibits the introduction of hearsay evidence unless an exception to the hearsay rule applies. *See id.* r. 5.802. The State concedes Peterson's testimony was hearsay, but it argues that exceptions to the hearsay rule apply. The State, as the proponent of the evidence, bears the burden of proving an exception to the rule against hearsay applies. *See State v. Walker*, 935 N.W.2d 874, 879 (Iowa 2019) (" 'The State, as the proponent of the evidence, has the burden' to establish the testimony comes within the exception to the rule." (quoting *Smith*, 876 N.W.2d at 189)); *State v. Cagley*, 638 N.W.2d 678, 681 (Iowa 2001) ("The State, as proponent of the hearsay evidence, has the burden of proving it falls within an exception to the hearsay rule.").

### B.

The State first contends Peterson's hearsay testimony was admissible as statements made for the purposes of medical diagnosis and treatment. *See* Iowa

R. Evid. 5.803(4). We disagree. "The medical diagnosis or treatment exception imposes two requirements." *Smith*, 876 N.W.2d at 185. First, the exception applies to the patient's statements "made for purposes of medical diagnosis or treatment." *Id.* (quoting Iowa R. Evid. 5.803(4)). "Second, the statements must describe 'medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.' " *Id.* (quoting Iowa R. Evid. 5.803(4)). Peterson's testimony did not involve Jackson's statements made for the purposes of medical diagnosis or treatment. Instead, Peterson's testimony involved the statements of unknown providers who observed Jackson at Broadlawns. The exception is inapplicable here.

### C.

The State contends, and the court of appeals agreed, that Peterson's hearsay testimony was admissible under the business records exception to the rule against hearsay. *See* Iowa R. Evid. 5.803(6). We disagree. The rule provides for the admission only of "[*a*] *record* of an act, event, condition, opinion, or diagnosis" that would otherwise be disallowed by the rule against hearsay. *Id.* (emphasis added). According to the text of the rule, the proponent of the evidence must show:

> (A) *The record* was made at or near the time by—or from information transmitted by—someone with knowledge;

> (B) *The record* was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) Making *the record* was a regular practice of that activity;

> (D) All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with rule 5.902(11) or rule 5.902(12) or with a statute permitting certification; and

      (E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Id.* (emphases added). It is clear from the plain language of the rule that it applies only to the admission of records as an exception to the rule against hearsay and not testimony about records in lieu of the records themselves. Indeed, we have said a "foundational element[]" of the rule is that the proffered evidence must be a "business record." *State v. Reynolds*, 746 N.W.2d 837, 841 (Iowa 2008); *see also Beachel v. Long,* 420 N.W.2d 482, 484 (Iowa Ct. App. 1998). In short, the rules of evidence create a "business records exception" to the rule against hearsay and not a "testimony about business records exception" to the rule against hearsay. *See Bolin v. State,* 736 So. 2d 1160, 1167 (Fla. 1999) (per curiam) ("Oral testimony concerning business records is not admissible under this exception.").

Our conclusion that rule 5.803(6) does not allow testimony about business records in lieu of the records themselves is supported by federal precedents. Iowa rule 5.803(6) is the same as Federal Rule of Evidence 803(6). Because of the similarity between the two rules, "interpretations of the federal rule are often persuasive authority for interpretation of our state rule." *State v. Paredes*, 775 N.W.2d 554, 561 (Iowa 2009). Federal courts hold that the business records exception to the rule against hearsay permits the admission of business records and not oral testimony in lieu of the business records.

In *United States v. Wells*, the Fifth Circuit vacated a conviction for conspiracy to distribute cocaine because it found the admission of hearsay testimony reversible error. 262 F.3d 455, 457 (5th Cir. 2001). The government called a witness to testify regarding the contents of a destroyed drug ledger. *Id.* at 459. The government argued that the business records exception permitted the testimony regarding the contents of the records. *Id.* The court disagreed and

concluded this was reversible error. *See id.* at 462 (explaining it was reversible error to permit "hearsay testimony as to the contents of documents that were not themselves introduced into evidence" (quoting *United States v. Marshall,* 762 F.2d 419, 428 (5th Cir. 1985))). Admitting testimony regarding the content of business records instead of the records themselves "would, in effect, be allowing an end run around the rule against hearsay and the requirements of the business records exception." *Id.*

In *United States v. Florez,* the government called a DEA agent to testify regarding telephone records that connected the defendant to a drug courier. 516 F. App'x 790, 793 (11th Cir. 2013) (per curiam). The government did not introduce the records themselves into evidence. *Id.* at 794. The Eleventh Circuit found this was error: "[Although] [t]he records would have been admissible as an exception against hearsay under Federal Rule of Evidence 803(6)(B), . . . there is no hearsay exception for testimony about records not in evidence. Thus, it appears that an error that was plain occurred with respect to the admission of the challenged portions of [the DEA agent's] testimony." *Id.* The Eleventh Circuit concluded not only that the district court committed error but also that the district court's error was plain.

Other federal courts are in accord with *Wells* and *Florez. See F.D.I.C. v. Houde,* 90 F.3d 600, 606 (1st Cir. 1996) (disallowing custodian whose "testimony might well have been sufficient to authenticate business records" from testifying regarding the content of documents where proponent "did not have any of the underlying documents with it at trial"); *Folkerts v. Seterus, Inc.,* No. 17 C 4171, 2019 WL 1227790, at *10 (N.D. Ill. Mar. 15, 2019) (stating that "the business-records exception found in Rule 803(6) is a mechanism by which a party may seek to admit the records themselves" and that "[i]t is not a mechanism for admitting testimony that is derived from the records, from

individuals who otherwise lack personal knowledge"); *Carlisle v. Nat'l Com. Servs., Inc.*, No. 1:14–CV–515–TWT–LTW, 2016 WL 4544368, at *4 (N.D. Ga. July 22, 2016), ("Testimony regarding the contents of business records, unsupported by the records themselves, by one without personal knowledge of the facts underlying the records constitutes inadmissible hearsay."); *NRRM, LLC v. Mepco Fin. Corp.*, No. 10 C 4642, 2015 WL 1501897, at *10 (N.D. Ill. Mar. 27, 2015) ("[The defendant] is probably right that Rule 803(6) allows the admission only of the business records themselves, not testimony about records not in evidence."); *Kidd v. Jackson*, No. 10–cv–4112 (SRN/SER), 2012 WL 6569293, at *3 (D. Minn. Dec. 17, 2012) (concluding that testimony about the contents of a document by someone who did not create the document is improper hearsay evidence); *Boclair v. Beardan-Monroe*, No. 10–cv–978–SCW, 2012 WL 3835874, at *4 (S.D. Ill. Sept. 4, 2012) ("The business record exception, however, only applies to the business *record*, not a witness' testimony referencing facts found in the business record."); *Snowdon v. A.W. Chesterton Co.*, 366 F. Supp. 2d 157, 165 (D. Me. 2005) (finding that testimony in the absence of the documents themselves was nothing more than hearsay); *Bus. Info. Grp., Inc. v. Bell Atl. Sys. Leasing Int'l, Inc.*, No. 90 C 20291, 1992 WL 281367, at *3 (N.D. Ill. Oct. 8, 1992) (holding that business records exception did not permit testimony in lieu of the records); *In re Sung Ho Cha*, 483 B.R. 547, 553 (Bankr. 9th Cir. 2012) (noting that testimony "would run afoul of the hearsay rule if he testified regarding the specific provisions of the written document").

We also find persuasive the decisions of numerous state courts that have interpreted business records exception to the rule against hearsay. *Helton v. Bank of Am., N.A.* concerned a foreclosure action. 187 So. 3d 245, 246 (Fla. Dist. Ct. App. 2016). A witness testified regarding the bank's records that showed a notice of default had been sent to the mortgagor without the underlying records

being admitted into evidence. *Id.* The court concluded this was error because the business records exception had not been met. It reasoned that "[w]hile the business records exception to the hearsay rule allows the admission of a memorandum, report, record, or data compilation, it does not authorize hearsay testimony concerning the contents of business records which have not been admitted into evidence." *Id.* at 247 (quoting *Thompson v. State*, 705 So. 2d 1046, 1048 (Fla. Dist. Ct. App. 1998)).

In *State v. Cofer*, the defendant challenged the admission of oral testimony establishing the price of a television he had stolen. 261 P.3d 1115, 1117 (N.M. Ct. App. 2001). The district court permitted a witness to testify regarding the price based on the witness's review of business records. *Id.* The court found error. It concluded that "it is clear that the business records exception requires some form of document that satisfies the rule's foundational elements to be offered and admitted into evidence and that testimony alone does not qualify under this exception to the hearsay rule." *Id.* at 1119.

In *Ingles Markets, Inc. v. Martin*, a supermarket was sued for a slip and fall accident occurring on its property. 513 S.E.2d 536, 537 (Ga. Ct. App. 1999). The supermarket offered into evidence testimony regarding a document that purported to show the floor was cleaned about twenty minutes before the incident. *Id.* at 538. However, the supermarket did not actually introduce the document into evidence. *Id.* The court held that the testimony was inadmissible hearsay. It found that "[t]estimony regarding the contents of business records, unsupported by the records themselves, by one without personal knowledge of the facts constitutes inadmissible hearsay." *Id.*

Other state court decisions are in accord with *Helton, Cofer*, and *Ingles Markets. See State v. Gallegos*, No. 1 CA–CR 09–0653, 2010 WL 5058580, at *3 (Ariz. Ct. App. Sept. 30, 2010) ("Moreover, the public and business records

exceptions provide only for introduction of the record into evidence. They do not allow a witness to testify as to what the record states. 'One having no independent knowledge cannot establish by oral testimony facts contained in a written record.' " (citation omitted) (quoting *State v. Ceja*, 546 P.2d 6, 8 (Ariz. 1976) (en banc))); *Barnes v. State*, 739 So. 2d 1181, 1182 (Fla. Dist. Ct. App. 1999) (per curiam) ("Here, although the court claimed it was relying on the business records exception to the hearsay rule, the state never sought to admit the file as a business record. Instead, the state offered only the probation officer's testimony regarding the contents of the file. Consequently, the business records exception does not apply." (citation omitted)); *Thompson*, 705 So. 2d at 1048 ("While the business-records exception to the hearsay rule allows the admission of '[a] memorandum, report, record, or data compilation,' it does not authorize hearsay testimony concerning the contents of business records which have not been admitted into evidence." (quoting Fla. Stat. § 90.803(6)(a) (1995))); *State v. Watkins*, 224 P.3d 485, 492 (Idaho 2009) (stating "[i]n the absence of any document, . . . there was simply no 'business record' that might fall within this hearsay exception"); *Bass v. Wash. Kinney Co.*, 457 N.E.2d 85, 96 (Ill. App. Ct. 1983) ("[I]t is only the business record itself which is admissible, and not the testimony of a witness who makes reference to the record."); *State v. Cox*, 908 P.2d 603, 615 (Kan. 1995) (holding business records exception did not apply to testimony); *State v. Johnson*, No. A08–1138, 2009 WL 2150671, at *4 (Minn. Ct. App. July 21, 2009) (holding a witness may not testify as to the content of business records that are not admitted into evidence); *State v. Cicerchi*, 915 N.E.2d 350, 360–61 (Ohio Ct. App. 2009) ("Although Evid. R. 803(6) permits introduction of records of regularly conducted activity, that exception concerns the introduction of the documents themselves, not oral testimony such as the witness for Novastar gave."); *Deep Keel, LLC v. Atl. Priv. Equity Grp., LLC,*

773 S.E.2d 607, 614–15 (S.C. Ct. App. 2015) ("The plain language of [South Carolina Rule of Evidence] 803(6) allows for the admission of '[a] memorandum, report, record, or data compilation,' not testimony describing such a document. We hold Rule 803(6) does not apply to admit live testimony offered to prove the contents of a record containing hearsay when that record is not offered in evidence."); *C.J. Andrews, O.D., P.C. v. Tex. State Optical, Inc.*, No. 05–91–00719–CV, 1992 WL 106026, at *2 (Tex. Ct. App. May 19, 1992) ("Likewise, this Court has said that oral testimony based on entries contained in written records without producing the source of such information is hearsay."); *Finn v. Finn*, 658 S.W.2d 735, 745 (Tex. Ct. App. 1983) (en banc) ("Oral testimony based on entries contained in written records without producing the source of such information is hearsay."); *Tripp v. Vaughn*, 746 P.2d 794, 799 (Utah Ct. App. 1987) (stating "testimony . . . cannot qualify as a business records exception" because "[t]he rule applies to written documents such as memoranda, records or reports and by its terms does not include oral statements").

The dissent disagrees with our controlling precedents, the federal precedents, and other states' precedents and concludes that the business records exception to the rule against hearsay permits hearsay testimony regarding business records without admission of the underlying records. The only case the dissent can find supporting this proposition is *In re Lynch*, 755 Fed. App'x 920 (11th Cir. 2018) (per curiam). In a summary judgment proceeding—not trial—that court concluded a witness's affidavit could be considered at summary judgment because she obtained personal knowledge of the company's finances through reviewing the business's financial records. *Id.* at 924. In a footnote, the panel expressed its disagreement with Florida law (cited above) regarding the business records exception. *Id.* at 924 n.4. *Lynch* is an outlier

decision. It is contrary to all other federal decisions and to the leading treatise on the federal rules of evidence, *Federal Practice and Procedure*:

> Given the language of Federal Rule of Evidence 803(6) [(the business records exception)], courts generally assume that the business "record" itself must be introduced, not solely testimony about the contents of a qualifying record. Although largely unnoticed in commentary, the rules' drafters seem to purposefully alternate between exceptions that cover "a statement" and others that cover "a record"; a point driven home by Rule 803(8) which covers a "record or statement." Consequently, for exceptions like Rule 803(6) that explicitly cover only a "record," it would appear that the drafters intended that the record itself, as opposed to testimony about the record or statements contained within the record, would be introduced under the exception.

30B Charles Alan Wright & Jeffrey Bellin, *Federal Practice and Procedure* § 6868, West (database updated Apr. 2023) [hereinafter *Federal Practice*] (footnote omitted).

We adhere to our controlling precedents and follow the persuasive precedents and the leading treatise. The business records exception to the rule against hearsay allows for the admission of business records and not testimony in lieu of the business records. Because the State, as proponent of the evidence, failed to establish an exception to the rule against hearsay, we conclude the district court erred in admitting the challenged testimony. While Peterson's testimony may also have violated the best evidence rule, *see* Wright & Miller § 6868 ("Testimony about a business record that is not itself introduced into evidence could *also* trigger a 'best evidence' objection under Federal Rule of Evidence 1002." (emphasis added)), we need not reach that argument to resolve this appeal.

## D.

The dissent also contends that Jackson waived or forfeited this argument on appeal. The dissent misapplies our law regarding waiver and forfeiture.

A party forfeits an issue on appeal when the party does not include the issue in its main brief. *See State v. Erdman*, 996 N.W.2d 544, 551 n.2 (Iowa 2023); *Goodenow v. City Council*, 574 N.W.2d 18, 27 (Iowa 1998). A party forfeits an issue on appeal when the party fails to clearly identify an issue on appeal. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018). A party forfeits an issue on appeal when the party fails to make an argument in support of the issue. *See State v. Vaughan*, 859 N.W.2d 492, 503 (Iowa 2015); *State v. Short*, 851 N.W.2d 474, 479 (Iowa 2014). A party forfeits an issue on appeal when the party fails to make more than a perfunctory argument in support of the issue. *See State v. Tyler*, 867 N.W.2d 136, 166 n.14 (Iowa 2015). A party forfeits an issue on appeal when the party fails to cite any authority in support of the issue. *See* Iowa R. App. P. 6.903(2)(*g*)(3) (2021). And, with respect to state constitutional claims, a party forfeits an issue on appeal when the party fails to develop his state constitutional claim in any meaningful way. *See In re V.H.*, 996 N.W.2d 530, 537 (Iowa 2023). None of these rules of forfeiture are applicable here.

Jackson did all he needed to do to present his hearsay argument on appeal. He argued in his main brief that Peterson's testimony violated the rule against hearsay. The State concedes Peterson's testimony was hearsay and its admission violated the rule against hearsay unless an exception applied. Because this case involves an evidentiary ruling, the State, as proponent of the evidence, was allowed to introduce new grounds on appeal to affirm the district court's ruling even though the grounds were not raised in the district court. *See Smith*, 876 N.W.2d at 184. Jackson, as the appellant, had no obligation in his main brief to anticipate what those grounds might be and prebut any and all arguments the State could have raised in its brief. Further, Jackson had no obligation to file a reply brief to rebut the arguments in the State's brief. *See* Iowa R. App. P. 6.903(4) (stating a party "may" file a reply brief).

Once Jackson established Peterson's testimony violated the rule against hearsay (as the State concedes he did), the State, as the proponent of the evidence, had the burden of establishing each of the elements of an exception to the rule against hearsay regardless of Jackson's response, if any, in his reply brief. *See Walker*, 935 N.W.2d at 879; *Smith*, 876 N.W.2d at 189; *Cagley*, 638 N.W.2d at 681; *see also United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012) (stating the opponents of the evidence had "no obligation to affirmatively *disprove* the applicability of the business records exception" because "[t]he burden was on the government alone"); *Berroteran v. Superior Ct.*, 505 P.3d 601, 620 (Cal. 2022) (concluding intermediate appellate court erred when it "shifted the burden of proof concerning this hearsay exception to the opponent of the evidence"); *Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005) ("Appellant objected to the testimony as hearsay; it was hearsay, and thus his objection was both proper and sufficient. If the testimony fit some exception or exemption to the hearsay rule[,] . . . the State, as the proponent of the evidence, had the burden of demonstrating the applicability of that exemption or exception." (footnote omitted)).

We may affirm an evidentiary ruling on a new ground raised on appeal only if there is a "proper basis" for doing so. *State v. Maxwell*, 743 N.W.2d 185, 192 (Iowa 2008) ("We are obliged to affirm an appeal where any proper basis appears for a trial court's ruling, even though it is not one upon which the court based its holding." (quoting *Citizens First Nat'l Bank v. Hoyt*, 297 N.W.2d 329, 332 (Iowa 1980) (en banc))). Because the state failed to establish an element of the business records exception to the rule against hearsay—that the proffered evidence was a record—there is no "proper basis" to affirm the admission of Peterson's hearsay testimony under this exception. *See Federal Practice* § 6803 ("The proponent of the statement, however, 'bears the burden of proving each

element of a given hearsay exception or exclusion.' " (quoting *United States v. Day*, 789 F.2d 1217, 1221 (6th Cir. 1986))). The dissent's contention that we could affirm the admission of concededly hearsay testimony under an exception clearly not applicable is without merit.

IV.

When the district court erroneously admits hearsay into evidence, as it did here, "[w]e presume prejudice—that is, a substantial right of the defendant is affected—and reverse unless the record affirmatively establishes otherwise." *State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) (quoting *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004)). The record affirmatively establishes lack of prejudice if the record shows the hearsay evidence did not affect the jury's finding of guilt. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). "One way to show the tainted evidence did not have an impact on the jury's verdict is to show the tainted evidence was merely cumulative." *Id.* Another way "the State can overcome this presumption is through overwhelming evidence of the defendant's guilt." *State v. Skahill*, 966 N.W.2d 1, 15 (Iowa 2021).

The record does not affirmatively establish a lack of prejudice with respect to three of Jackson's convictions. For the charge of vehicular homicide (OWI), the State was required to prove Jackson's intoxication caused the death of Lovan. For the charge of reckless driving (Jackson was acquitted of vehicular homicide, reckless driving), the State was required to prove Jackson drove in a reckless manner. For the charge of leaving the scene of an accident resulting in death, the State was required to prove Jackson knew the accident resulted in injury or death to another person. Jackson's medical condition—specifically, whether he blacked out—was a critical piece of evidence bearing on each of these charges. Peterson's hearsay testimony offered to rebut Jackson's testimony was not cumulative of other evidence; there was no other evidence admitted regarding

Jackson's medical condition. This is also not a case of overwhelming evidence. An eyewitness said it looked like the driver of the Prius suffered a medical issue. The data from the car—showing Jackson did not swerve or brake—seems more consistent with a medical emergency than with intoxication. The State's expert on accident reconstruction could not opine that the cause of the accident was intoxication. And the State's toxicologist could not opine that Jackson was intoxicated based on the chemical blood test. We thus must vacate Jackson's convictions for these offenses.

We reach a different conclusion with respect to Jackson's conviction for operating a motor vehicle without the owner's consent. On this charge, the State was required to prove Jackson took possession and control of the vehicle without the owner's consent. Jackson testified he had possession and control of the vehicle and that he took the vehicle to run errands. Downey testified that Jackson did not have permission to use his vehicle. Jackson testified that he blacked out while he was driving on Martin Luther King Jr. Parkway, after he already had taken possession and control of the vehicle for his own purposes. Jackson's blackout while driving, even if true, had no bearing on whether he initially took possession and control of the vehicle without the owner's consent.

V.

For these reasons, the decision of the court of appeals is affirmed in part and reversed in part. We affirm Jackson's conviction for operating a motor vehicle without the owner's consent. We vacate Jackson's convictions for vehicular homicide (OWI), reckless driving, and leaving the scene of an accident resulting in death. We remand this case for further proceedings.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Oxley, McDermott, and May, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part, in which Christensen, C.J., and Waterman, J., join.

MANSFIELD, Justice (concurring in part and dissenting in part).

I would affirm the convictions and sentence in this case. I believe that all of David Jackson's appellate arguments are without merit. The majority reverses on a ground not argued by Jackson.

This case presents the not-unusual circumstance where a defendant charged with a serious crime takes the stand and claims, for the first time, that he "blacked out" at the time of the alleged offense. Jurors have to weigh this defense: Did the defendant really black out or does the defendant simply not want to face what happened or, perhaps, lack a good explanation for it? And prosecutors sometimes have to scramble to rebut this defense.

Here, the prosecution responded by calling the health services administrator at the Polk County Jail to testify that Jackson's medical records, of which Dale Peterson was the custodian at the jail, were at odds with Jackson's self-proclaimed medical history. Jackson's counsel made a series of objections below to Peterson's testimony but didn't argue that the records needed to be produced in lieu of testimony. Nor does Jackson's appellate counsel in the current appeal. The majority grants what Jackson does not seek.

I. Putting the Peterson Testimony in Context.

Some additional factual context from this case is helpful. While I would not argue that any error in the admission of Peterson's testimony would have been harmless, there was substantial evidence that the defendant was under the effects of methamphetamine at the time of the accident and little corroboration or consistency for his claim of a blackout.

Not mentioned by the majority is that Jackson's behavior after the accident was largely caught on surveillance video. The video shows Jackson walking briskly away from the scene of the accident with his gym bag that he had pulled

out of the vehicle. Upon reaching a nearby senior living center, Jackson entered the foyer. He looked behind himself nervously and repeatedly as if to check if anyone was following him. He pulled on the door and hit a buzzer to try to enter the building. Unable to do so, Jackson shuffled through his gym bag, pulled a baseball cap out, put the hat on, and sat down on a bench in front of the building with two women who were previously there.

Officer Christopher Latcham received a description of the driver who had fled from the wrecked Prius. On his bodycam, Officer Latcham is shown asking for assistance and being directed to the bench in front of the senior living senior center. Officer Latcham encountered Jackson in front of the senior living center and began to question him. Jackson asked, "What's wrong?" When Jackson started to run, Officer Latcham chased after him and pepper-sprayed him. Jackson was subdued and handcuffed by another police officer, Officer Nathan Nemmers. Officer Nemmers noticed that Jackson "had bloodshot, watery eyes, seemed a little paranoid," and was "sweating profusely." Officer Nemmers thought that Jackson could be under the influence of drugs or alcohol, but he did not smell any odor of an alcoholic beverage. As it turned out, Jackson had methamphetamine in his blood.

At trial, Jackson took the stand in his own defense. Jackson acknowledged that he had lost his driving privileges at the time of the accident. He said he had borrowed the Toyota Prius from a friend to run a couple of errands, specifically to stop by his daughter's house to see if she was going to be able to pick him up from work the next day and to stop by another friend to see if he was going to come by later on. This probably seemed a little odd to the jury: Why not just *call* the friend and the daughter if you need to ask these brief questions instead of driving illegally to go see them? But Jackson's counsel then changed the subject

and asked, "You stated, however, you needed to get a note for work; is that correct?"

Actually, no one had referred to a note for work until Jackson's counsel raised the subject. Counsel then led Jackson through some more questioning until Jackson testified that he was heading to Broadlawns at the time of the accident to get a note so he could return to work. According to Jackson, he had been in quarantine for possible exposure to COVID-19 and needed a note from Broadlawns to go back to work the next morning—August 10, 2020.

Jackson claimed that he felt fine on August 9 but that he had blacked out a couple of times in the recent past. According to Jackson, a third blackout occurred that evening of August 9 and caused him to have the accident. Suddenly, while driving on Martin Luther King Jr. Parkway that evening, Jackson "started to have . . . tightness in [his] chest," and he "passed out, blacked out at the wheel." According to Jackson, he lost consciousness for only a matter of seconds—from just before until just after the collision with the Slingshot. Jackson testified to having no memory of the collision itself.

Jackson claimed that when he came to, he didn't realize that he had collided with another vehicle. According to Jackson, his head was throbbing and his ears were ringing. After exiting the vehicle, he decided to try to walk to Broadlawns. He claimed that he mistook the senior living center for Broadlawns.[1] He said he did not believe he was impaired or intoxicated while driving that evening, although he had taken an ecstasy pill two or three days earlier.[2] He believed his condition on August 9 was due to blacking out and had no

---

[1] I suspect that a Polk County jury would have had members who were familiar with Broadlawns. They would have drawn their own comparison between Broadlawns and the senior apartment building shown on video.

[2] Jackson had no ecstasy in his system, and he claims the pill must have contained methamphetamine.

connection to any substances in his blood. According to Jackson, he was not intoxicated on anything "[b]esides Gatorade maybe."

Jackson also testified that upon being transported to Broadlawns on August 9, he was admitted to the ICU. He said his heart rate had reportedly dropped to 34, and "[t]hey said they were waiting to see if [his] heart was going to stop again."

Jackson sought to introduce three exhibits. One, which was admitted, was an authorization dated July 27, 2020, for Broadlawns to release COVID-19 testing information to Jackson's employer. Another document, which was not admitted on grounds of lack of foundation, authentication, relevance, and hearsay, was apparently a standard guidance for persons exposed to COVID-19. The third document was not admitted for the same reasons and apparently related to the same subject.[3]

Having had no prior notice of Jackson's "blackout" defense, the State summoned Peterson to testify as a rebuttal witness the next morning. Peterson was the health services administrator of the Polk County Jail and the custodian there of Jackson's medical records. Peterson testified that when Jackson arrived at the jail on August 10, certain medical records came with him from Broadlawns. Over Jackson's objections, Peterson testified regarding the contents of those records and the records of the initial screening performed at the jail. The district court overruled Jackson's privilege objection on the ground that "the defendant . . . opened the door . . . during his direct examination." The district court overruled the best evidence objection on the ground that "[t]his is not the type of testimony the best evidence rule is designed to regulate." The district court overruled the hearsay objection on the ground that the records either were

---

[3]The defendant did not include the actual unadmitted exhibits in an offer of proof.

not being offered for the truth of the matter asserted or involved Jackson's statements of his own medical condition. *See* Iowa Rs. Evid. 5.801(*c*)(2), 5.803(3).

According to Peterson, Jackson's records did not indicate that he was having difficulty breathing; they showed stable vital signs within normal limits, and they reflected a normal oxygen level. There was no indication in the records that Jackson had any problems with blacking out. The records also mentioned that precautions were being taken for alcohol and opioid detoxification. According to Peterson, any implementation of those precautions would have been based on statements made by Jackson to jail staff.

**II. The Contents of Jackson's Medical Records Were Not Inadmissible Hearsay.**

As I've noted, Jackson's complaint is not that Peterson *testified* to the contents of Jackson's medical records. It is that the contents of those records *came into evidence at all.*

In overruling this objection, the district court did not err, although I disagree somewhat with its legal rationale. Medical records are often business records, even when generated by another medical facility.

Iowa Rule of Evidence 5.803(6) (2021) provides a hearsay exception for:

(6) *Records of a regularly conducted activity.* A record of an act, event, condition, opinion, or diagnosis if:

(A) The record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) Making the record was a regular practice of that activity;

(D) All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that

complies with rule 5.902(11) or rule 5.902(12) or with a statute permitting certification; and

(E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

In *State v. Buelow*, we recently reversed a murder conviction because the decedent's mental health records had been improperly excluded at trial. 951 N.W.2d 879, 890 (Iowa 2020). The defendant claimed that the decedent had committed suicide. *Id.* at 883. In the course of our opinion, without detailed analysis, we concluded that the decedent's "medical records [were] admissible hearsay under the exception for records of a regularly conducted activity." *Id.* at 884 (citing Iowa R. Evid. 5.803(6)).

As one commentator has explained,

> As anyone who has visited a doctor's office or emergency room--or urgent care clinic, ambulatory surgical center, or strip mall imaging operation--can attest, modern medicine is very much a business. It is unsurprising, then, that "[m]edical records can be offered into evidence under the business records exception, provided the party offering the records for admission can meet the requirements set forth in Rule 803(6)." Such records neatly fit within the Rule's definition. Medical practitioners usually have direct knowledge of the condition, activity, or diagnosis. They prepare records at or around the time of examination, particularly as inputting information into EHRs on tablets, laptops, or floating workstations becomes nearly universal. Furthermore, they are in the business of conducting medical examinations and diagnosing and treating medical conditions. Likewise, the presumption of trustworthiness created by the need to run an effective business is also present with respect to medical records.

Paul W. Kaufman & Christopher J. Merken, *Toward a Presumptive Admission of Medical Records Under Federal Rule of Evidence 803(4)*, 64 B.C. L. Rev. 567, 600–01 (2023) (alteration in original) (footnotes omitted) (quoting *Tucker v. Nelson*, 390 F. Supp. 3d 858, 863 (S.D. Ohio 2019)).

Furthermore, "[t]his principle has also been extended to the admission of records from other businesses under what we call the 'business-reliance doctrine': when the records of Business A include and rely upon the business records of Business B, B's business records are admissible as A's business records." *Id.* at 604. In other words: "A document prepared by a third party may qualify as another business entity's business record under [the business records exception] if that entity integrated the third-party record into its records and relied upon it in its day-to-day operations." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 867 n.2 (N.D. Ill. 2010).

For example, the United States Court of Appeals for the Fifth Circuit upheld the introduction of invoices "received and held" by a company over a hearsay objection. *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977). While "[n]o testimony of the preparing company was offered," the receiving company testified that the "invoices were received and held in the regular course of business." *Id.* Thus, the invoices also constituted business records of the receiving company. *See id.*; *see also United States v. Childs*, 5 F.3d 1328, 1333 (9th Cir. 1993) ("Several circuits have held that exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, so long as the other requirements of Rule 803(6) are met and the circumstances indicate the records are trustworthy."); *Bank of N.Y. Mellon v. Shone*, 239 A.3d 671, 677 (Me. 2020) ("Multiple federal circuit courts and numerous other states have upheld the admission of integrated business records upon a showing of verification and reliance on the part of the receiving business, without the need for testimony from the originating business.").

The concept of integrated business records can also apply to medical records. As one treatise puts it, "[T]he custodian of the hospital records may lay a foundation from the ambulance records found in the patient's file." 7 Michael

H. Graham, *Handbook of Federal Evidence* § 803:6, at 354 (9th ed. 2020). "The MRI report received on the medical internet is not a record generated by the hospital itself. Here, however, like the ambulance report because the hospital relies upon this record[] and concurs in its recommendation upon making its own assessment, the MRI is treated the same as any other part of the patient's medical file." *Id.* Professor Graham concludes, "It is not required that the custodian have personal knowledge of the matters recorded, or of the persons creating the records, or the medical procedures regularly followed." *Id.* at 353.

Consider the following case from Washington. In *State v. Ziegler*, a doctor from a medical center testified regarding the victim's lab test results under the business records exception. 789 P.2d 79, 81 (Wash. 1990) (en banc). The defendant appealed, arguing that the test results were business records of the lab rather than the medical center and that the doctor could not testify to them. *Id.* at 82.

The Washington Supreme Court disagreed. *Id.* It considered the following facts in making its decision that the results were admissible as business records of the medical center:

> [The] treating physician ordered the . . . tests and relied upon the test results in his treatment of the child. The record was in the custody of [the medical center] as part of [the victim's] medical file. [The doctor] testified regarding his familiarity with the laboratory and its testing procedures.

*Id.* at 83.

I now turn to whether the elements of the business records exception were met in this case. Note that there are three preconditions to admissibility: paragraphs (A), (B), and (C) of rule 5.803(6). Note also that these conditions can be met by the testimony of "the custodian or another qualified witness." Iowa R.

Evid. 5.803(6)(D). In other words, the custodian doesn't have to lay all the foundation.

To begin, Peterson testified that he was "responsible for . . . the medical business records . . . that are kept with respect to individuals in the Polk County Jail." *See id.* He agreed that he was "the custodian." *Id.* Peterson also testified that when a person comes to the jail from a medical facility, the jail receives "discharge instructions for the patient and the actual discharge from the hospital for the patient." He also receives other medical records showing "treatment provided." This is important "if a patient has issues or medical concerns that need to be addressed." In other words, the jail relies on these records. These incoming medical records are then maintained by the jail as part of its own records. Thus, Peterson's testimony established that it is a regular practice of the jail to receive certain regularly maintained records of the medical facility which the individual comes from. *See id.* r. 5.803(6)(B)–(C).

Additionally, Peterson testified that the records were transmitted from Broadlawns electronically on August 10 when Jackson was admitted to the jail. Since Jackson had been taken to Broadlawns on the evening of August 9, the records would have been created contemporaneously or nearly contemporaneously with the conditions that were recorded. *See id.* r. 5.803(6)(A). There was also independent evidence that Jackson received medical treatment at Broadlawns that evening. Jackson testified that he did so and that Broadlawns determined that his heart rate had dropped. Also, Officer Nemmers testified that upon his arrival at the hospital, "some medical personnel were still attending to [Jackson]." Photographs were admitted showing Jackson on a hospital bed. Thus, the record supports an inference that any medical history and vital signs taken from Jackson would have been recorded by a person with knowledge. *Id.*

Peterson testified that the medical records from Broadlawns didn't reflect any concerns about breathing difficulties or a history of blacking out and that they showed his vital signs were stable and his blood oxygen level was normal. This is the type of information that would have been recorded by a person with a motivation to be accurate and no motivation to be inaccurate.

Of course, even if proper foundation is laid for medical records to be admitted, "this does not necessarily make everything in the records admissible." *In re Est. of Poulos*, 229 N.W.2d 721, 727 (Iowa 1975). For example, there could be hearsay within hearsay in the medical records. *See id.*

But here, the items referred to above—vital signs and medical history— would have been based either on firsthand recorded observations or on statements made by Jackson. There is therefore no hearsay-within-hearsay problem. *See id.* Nor has Jackson pointed to any source, method, or circumstance indicating a lack of trustworthiness. *See* Iowa R. Evid. 5.803(6)(E).

*Madison v. Colby*, 348 N.W.2d 202 (Iowa 1984) (en banc), cited by Jackson, is distinguishable. We held there that a hearsay objection should have been sustained when the defendants sought to offer the report of one doctor through the testimony of another doctor. *Id.* at 204. As we explained, "First, if offered as a business record of Dr. Hall to prove assertions of Dr. Routman, exclusion would be required under the 'hearsay within hearsay' or double hearsay rule." *Id.* Moreover, we added, "the defendants failed to show that Dr. Routman's record was made in the regular course of business at or about the time of the events recorded or that the sources of information and method of preparation were such as to indicate its trustworthiness." *Id.*

The present case is different. The State proved both that the discharge records had been made at or about the time of the events recorded by persons with firsthand knowledge and that it was a regular practice for these records to

have been prepared and turned over to the jail. In *Madison*, by contrast, the second doctor simply testified "that he obtained [the first doctor's] record to assist him in treating [the plaintiff]." *Id.* at 203–04. The foundation for admission of an integrated business record was not laid in *Madison.*

There is one other aspect of Peterson's testimony regarding the medical records that I have not discussed. Peterson also testified that the jail records reflected that Jackson was immediately placed on detox precautions. According to Peterson, that was a regular practice of the jail "[a]ny time a patient [upon arrival] states daily use or use of opioids or alcohol more than one to five days a week." Hence, Peterson's testimony confirmed that the information that would have been regularly and contemporaneously recorded in the regular course of activity of the jail based on statements made by the defendant. *See* Iowa R. Evid. 5.803(6)(A)–(C).

There remains the issue of trustworthiness with respect to the jail protocol. It is the opponent's burden to "show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* r. 5.803(6)(E). Here, at least, the record does not indicate that this was an untrustworthy way to prove that an inmate had acknowledged prior opioid or alcohol use.

The foregoing discussion addresses the entirety of Jackson's hearsay argument on appeal. And because that argument lacks merit and the majority has let the court of appeals decision stand on everything else, Jackson's convictions and sentence should be affirmed.

### III. The Majority Reverses on a Ground Not Argued by Jackson.

The majority reverses most of Jackson's convictions on a ground not urged by Jackson. According to the majority, while the jail medical documents themselves may have been admissible, it was error for Peterson to testify about

them. I think the majority raises a legitimate theoretical point, but not one that is part of this appeal.

One might say the problem raised by the majority has to do with the "best evidence" rule, not the hearsay rule. That rule provides, "An original writing, recording, or photograph is required to prove its content, unless these rules or a statute provides otherwise." Iowa R. Evid. 5.1002. The State sought to prove the content of Jackson's medical records, not through the records themselves, but through the testimony of Peterson.

Using Peterson to testify to what the records said isn't a separate hearsay problem; Peterson has firsthand knowledge of the records themselves and is available for cross-examination. However, it is potentially a violation of the best evidence rule. *See In re Est. of Cory*, 169 N.W.2d 837, 847 (Iowa 1969) (holding that an objection should have been sustained when "Dr. Nord referred to the contents of an autopsy report over timely objection that his testimony was not the best evidence"); 6 Mark S. Brodin et al., *Weinstein's Federal Evidence* § 1002.05[1], at 1002-15 to 16 (2d ed. 2023) ("[T]he rule *does* apply when a witness seeks to testify about the contents of a writing, recording, or photograph without producing the physical item itself."); 2 Robert P. Mosteller et al., *McCormick on Evidence* § 234, at 140 (8th ed. 2020) (explaining that when a testifying witness is "relying on a writing, recording or photograph that the witness has read or observed outside of court," and "the proponent of the witness's testimony does not present that document in court, there is likely to be a violation of the best evidence rule").

The majority does collect a body of cases saying that you need to introduce the actual physical record in order to make use of the business records hearsay exception. Under this view, "record," as used in rule 5.803(6), refers to *what you*

*are bringing to the courtroom*, not merely *what you are proving up*. But there is authority to the contrary:

> Nothing in Federal Rule of Evidence 803(6) suggests the hearsay exception applies to statements made in business records only if the records have been separately admitted into evidence. If a proper foundation has been provided to show that a business's record-keeping practices are sufficiently reliable under Rule 803(6), statements from the business's records are not inadmissible as hearsay—regardless of whether the records are separately admitted into evidence. If, however, a witness testifies about the contents of documents that have not been separately admitted into evidence, that testimony may be excluded under Federal Rule of Evidence 1002, provided that an exception to the so-called 'best-evidence rule' does not apply.

*In re Lynch*, 755 F. App'x 920, 924 n.5 (11th Cir. 2018) (per curiam) (finding that the appellants' hearsay objections were properly overruled and that the appellants did not preserve an objection based on the best evidence rule).

Regardless of nomenclature, though, no such objection is before us. Nowhere does Jackson raise *the concept* that now serves as the basis for his new trial. Jackson says, "Peterson's testimony about information contained in Jackson's Broadlawns medical records is black-letter hearsay." But as Jackson's citation to *Madison* and his briefing make clear, his "black-letter hearsay" objection is to the introduction of information from the medical records without adequate foundation, not that the information came in through Peterson's testimony rather than the records themselves. Jackson criticizes the State for "eliciting hearsay evidence *from Jackson's Broadlawns records.*" (Emphasis added.)

In the reply brief, after the State invokes Iowa Rule of Evidence 5.803(6), Jackson goes on in the same vein: "[M]edical records are admissible under Rule 5.803(6) only upon proper foundation." And: "There was no testimony from anyone with knowledge of how Broadlawns generates and maintains its records."

Jackson makes no issue out of the State's use of testimony in lieu of introducing the records themselves.

It should be no surprise that the court of appeals panel, with over thirty years of combined appellate experience, concluded that Peterson's testimony was admissible under rule 5.803(6) without even considering the possibility that the records themselves had to be introduced. No one had argued that the actual documents needed to be put in evidence.

Even at the further review stage, with the benefit of the court of appeals decision, Jackson did not complain about the substitution of testimony for the records themselves. Rather, he reiterated that *foundation* was not established for the admission of the medical records. As he put it, quoting an unpublished decision out of the court of appeals, "Without the required foundation, the [testimony] did not qualify for the business-records exception." *State v. Fiems*, No. 18–2241, 2020 WL 1879700, at *4 (Iowa Ct. App. Apr. 15, 2020).

By not raising any objection to Peterson's testimony as a way of proving the contents of the medical records, Jackson waived the point. *See Ruiz v. State*, 912 N.W.2d 435, 441 (Iowa 2018) ("The doctrine of waiver applies to issues not asserted on appeal . . . ."); *see also State v. Torres*, 989 N.W.2d 121, 130 (Iowa 2023) (McDonald, J., concurring specially) ("To resolve this appeal, we need only address the issues actually presented.").

I am also not surprised that Jackson waived any complaint on appeal since the matter was not explored below. Before Peterson testified, there was a discussion outside the presence of the jury that went on for about seven pages of transcript. Most of the discussion focused on whether Jackson had waived the physician–patient privilege. Although Jackson's counsel used the terms "hearsay" and "best evidence," which is probably sufficient to preserve error, counsel never actually made the point that the records needed to be introduced

instead of having Peterson testify about them. Had counsel made that point, it might have been possible to present the records themselves, which were in electronic form according to Peterson. Although I am not certain, it appears to me that the prosecutor was simply being cautious when she developed a plan to use Peterson's testimony instead of actual records because she did not want to look at the records herself when there was a medical privilege issue that had not yet been resolved by the court.

Under these circumstances, I do not believe a new trial is warranted.

For the foregoing reasons, I dissent in part and would affirm all of Jackson's convictions and his sentence.

Christensen, C.J., and Waterman, J., join this concurrence in part and dissent in part.